**No. 53963.**—C. J. Tower & Sons *v.* United States, protest 138193–K (Buffalo).

MOLLISON, Judge: The merchandise the subject of this protest is described on the invoice as "Rough Roman Travertine Marble Slabs" and was assessed with duty by the collector of customs at the rate of 50 per centum ad valorem under the provision in paragraph 234 (c) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 234 (c)) for—

Freestone, sandstone, limestone, lava, and all other stone suitable for use as monumental or building stone, except marble, breccia, and onyx, not specially provided for, hewn, dressed, or polished, or otherwise manufactured, * * *.

The protest claim is for duty at the rate of 25 cents per cubic foot under the provision in paragraph 234 (b) of the same act for—

Travertine stone, unmanufactured, or not dressed, hewn, or polished, * * *.

A piece of travertine stone cut from one of the imported slabs was received in evidence without objection as an exhibit illustrative of the imported merchandise in all respects except in width and length. It consists of a roughly rectangular slab of buff-colored stone about an inch in thickness and having fairly even faces, but rough edges.

Competent and uncontradicted witnesses for the plaintiff testified that the imported condition of the travertine stone in question was not the result of hewing, dressing, or polishing, and that the evenness of the two faces was the result of a gang-sawing operation, in which a series of blades travel back and forth over the block of stone, and, in connection with a process using water and sand, in effect slice it into slabs of the thicknesses desired. It appears that travertine is taken from the earth in large blocks by dynamiting or band-sawing operations, and that the large blocks are gang-sawed into slabs of fairly even thicknesses as ordered.

It should be noted that none of the witnesses who testified as to the manner in which the travertine slabs at bar were produced had ever witnessed the process in the country of production, Italy, but they each had had much experience with travertine stone in this country, and were expert enough to be able to tell from an examination of the imported material what had been done to produce it.

Since, as has been said, it was established that the slabs of travertine at bar were not hewn, dressed, or polished, the issue is therefore resolved into the question of whether the gang sawing of the large blocks of travertine into slabs such as those imported "manufactured" the stone within the meaning of the term as used in paragraph 234 (c), *supra*, or left it "unmanufactured" within the meaning of that term as used in paragraph 234 (b), *supra*. It is obvious from a reading of subparagraphs (b) and (c) of paragraph 234, *supra*, that, so far as travertine stone is concerned, those subparagraphs were intended to cover travertine stone in all forms and stages from crude to advanced, and that in the order of advancement subparagraph (c) takes up where subparagraph (b) leaves off. Thus, subparagraph (b) provides for travertine stone "unmanufactured, or not dressed, hewn, or polished," while subparagraph (c) provides for a class of stone including travertine stone, "not specially provided for, hewn, dressed, or polished, or otherwise manufactured."

It is clear from the record that the quarried block is the crudest form in which travertine stone appears after separation from the earth. As to whether it ever appears in commerce in that form, the record is vague. The president of the importing company testified at one point—

* * * They [the sellers] generally sell a block of the nearest size to what you are asking for. (R. pp. 22–23.)

and at another point—

We order so many slabs, or we might order a block to produce certain slabs within a certain approximate size, so to produce slabs to approximate size. (R. p. 24.)

It appears that slabs, such as those at bar, are the next crudest form of travertine stone. Orders for slabs call for standard thicknesses, i. e., seven-eighths of an inch, 1 inch, 1¼ inches, etc., and for the approximate superficial area required. The thickness is not exact, but apparently any variation is on the side of excess thickness, rather than thinness. Thus, the illustrative exhibit, although said to come from a shipment in which the invoice calls for seven-eighths of an inch thickness, actually measures 1 inch in thickness. The excess is probably due to the fact that the dressing and finishing operations remove some of the surface. The edges of the imported slabs are always rough, and it appears that the invoice dimensions of each slab indicate the length and width of surface area which can be obtained from such slabs. Slabs are not necessarily ordered for specific jobs, but are frequently ordered for stock in standard thicknesses.

After importation, the slabs are cut to size for the particular job for which they are to be used, and then the surfaces are ground down (dressed), after which they are polished, as required.

In the brief filed on behalf of the plaintiff there is cited the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 63 Treas. Dec. 1570, Abstract 24326, which apparently involved travertine stone slabs in the condition of those at bar. It was held that such slabs were "unmanufactured." On the other hand, defendant has cited in the brief filed in its behalf a line of cases headed by *Stone & Downer Co.* v. *United States*, 55 Treas. Dec. 990, Abstract 7763, which involved travertine slabs also apparently in the condition of those at bar, and in which it was held that the sawing by which these slabs were reduced to form from large blocks was a process of manufacture which changed the condition of the stone and advanced it in value and condition.

Plaintiff has cited, as analogous to the situation in the case at bar, the case of *J. T. Steeb & Co., Inc.* v. *United States*, 16 Cust. Ct. 205, Abstract 50810. That case involved granite imported in the form of blocks split from the large quarried blocks roughly into dimensions suitable to be finished for monumental purposes. The provision of law there involved, paragraph 234 (a) of the Tariff Act of 1930, as modified by the Finnish Trade Agreement, T. D. 48554, contained language of a nature similar to that here in question. The granite had been assessed under the provision for "Granite suitable for use as monumental, paving, or building stone, not specially provided for: Hewn, dressed, pointed, pitched, lined, or polished, or otherwise manufactured" and was claimed to be dutiable under the provision for granite "Unmanufactured, or not dressed, pointed, pitched, lined, hewn, or polished."

In reaching the conclusion that the granite was entitled to classification under the latter provision, the court said:

The uncontradicted proof emphasizes that the statutory terms, "hewn," "dressed," "pointed," "pitched," "lined," and "polished," relate to operations that dedicate granite to a definite size, shape, and condition. All are processes associated directly with a definite advancement of material toward an ultimate article of commerce. The correlated series of specific statutory terms impart to their succeeding generic phrase, "or otherwise manufactured," a restriction, limiting the scope thereof to only such processes as are analogous with those specifically mentioned.

Applying the foregoing reasoning to the situation at bar, it would appear that while it is true that the gang sawing of the quarried blocks into the imported slabs advanced the travertine by serving partially to fit it for its ultimate use,

it nevertheless still left it only rough material upon which the operations which would dedicate it to definite size, shape, and condition were to be performed. The slabs, although sawn, were in no further advanced condition than were the rough granite blocks involved in the *Steeb* case, and for the same reasons were "unmanufactured." See also in this connection *United States* v. *National Importing Co. (Inc.) et al.*, 12 Ct. Cust. Appls. 186, T. D. 40169, wherein it was held that the cutting of amberoid into general shapes suitable for manufacture into pipe stems and other articles did not remove it from classification as "amberoid, unmanufactured."

Judgment will therefore issue sustaining the protest claim for duty at the rate of 25 cents per cubic foot under paragraph 234 (b), *supra*.

CONCURRING OPINION

COLE, Judge: My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am joining my colleagues in the disposition of this case, and concur in the opinion and judgment attached thereto.