(C.D. 2602)

QUALITY MARBLE & GRANITE CO. ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 21, 1965)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*John W. Douglas,* Assistant Attorney General (*Bernard J. Babb,* trial attorney), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The protests in these cases were consolidated at the trial and limited to the merchandise described on the invoices as travertine slabs, other than those described as being polished or hewn, and assessed with duty at 21 per centum ad valorem under paragraph 234(c) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108. It is claimed that said merchandise is properly dutiable at 10.5 cents per cubic foot under paragraph 234(b) of said tariff act, as modified.

The pertinent provisions of said tariff act, as modified, are as follows:

| Tariff Act of 1930, paragraph | Description of Products | Rates of Duty | | |
|---|---|---|---|---|
| | | A | B | C |
| 234(b) | Travertine stone, unmanufactured, or not dressed, hewn, or polished. | * * * | * * * | 10.5¢ per cu. ft. |
| 234(c) | Freestone, sandstone, limestone, lava, and all other stone suitable for use as monumental or building stone, except marble, breccia, and onyx, not specially provided for, hewn, dressed, or polished, or otherwise manufactured. | * * * | * * * | 21% ad val. |

At the trial, there were received in evidence two slabs of stone illustrative of the imported merchandise, marked plaintiffs' exhibits 1 and 2. C. E. Clouse, assistant appraiser at Los Angeles, testified that they were representative of a rough-sawn travertine slab, unfinished. The items on the invoices, which were of the same material and were represented by exhibits 1 and 2 and are involved herein, were identified by testimony or stipulation.

In addition to Mr. Clouse, three trade witnesses testified for the plaintiffs: W. A. Stephens, president and treasurer of Carrara Marble Co.; Patrick J. Ryan, a quarry representative and importer of marble, travertine, and other building stones; and Keith Cater, an employee of Selectile, Inc., in charge of installation of travertine in the Los Angeles area, and engaged in estimating and architectural contact work. Their testimony reveals that travertine is imported in block form, as rough-sawn slabs, as polished slabs, as material cut to the finished size for particular jobs, as tabletops, and other manufactured items.

Travertine is quarried with the use of a wire saw and sand and water to provide friction, or with a helical wire saw, a system of pulleys, and water, and a substance like plaster. The mass that is removed may weigh as much as 300 tons. This mass may be cut by the use of the same helical wire into commercial sized blocks. The crudest form of travertine dealt in by the trade is such block form. Such blocks are invoiced by cubic feet or by weight.

To obtain slabs such as plaintiffs' exhibits 1 and 2, the blocks are gang sawed. This operation was described by the witness Stephens as follows:

* * * They are put into a large contraption, which has an adjustable number of steel blades under tension, and these blades are spaced at the various thicknesses required, and they move back and forward together mutually, and again they pour water and sand on the blade.

According to Mr. Ryan, sand gangsaws have regular steel blades set close together or far apart, depending on the width of the slab that is required. They are hung from a frame and swing back and forth. The water and sand go under the blades and, when the blade comes back, it pushes the sand, which cuts the travertine.

Gangsaws operate 24 hours a day, and there may be 20 of them going at the same time. If the machine is not properly watched or the proper amount of sand and water applied, it may shift a little, so that the slabs may vary in thickness or have grooves or ledges in them. The surface may not be so accurate and true; it may be concave or convex, or the thickness may vary an eighth or a sixteenth of an inch

Blocks may also be cut into slabs by wire saws, diamond-bladed gangsaws, and helical wire saws. The methods used result in very little difference in effect on the surfaces.

Mr. Stephens testified that his firm ordered slabs in sizes from 5 to 11 feet long, from 3 to 5 feet high, and from thirteen-sixteenths of an inch to an inch and a quarter thick. Mr. Cater testified that he had handled slabs ranging from three-eighths of an inch to 4 inches thick and in sizes from 5 to 12 feet. Slabs are purposely cut by the gangsaw into various thicknesses. Dimensions are given on the packing lists attached to many of the invoices, but, according to Mr. Stephens, these are approximate, the slabs were not cut to size.

Slabs are shipped to the United States in so-called bundles, with a thick piece of wood at the base and supporting vertical pieces of lumber strapped together with steel bands. They are measured and invoiced according to square feet.

In its imported condition, a rough-sawn travertine slab can be finished for commercial use, but, in every case, it must be manufactured by cutting to size, grinding the surface, honing, and polishing before it can be used for its ultimate purpose. As imported, rough-sawn travertine slabs are not committed to any particular end use. After processing, they are used as flooring material, for building purposes of all kinds, for tabletops, wall veneering, church fixtures, fountains, and furniture facing. Mr. Cater stated that travertine which is used to make tile flooring is cut thinner from the block than that used for other purposes and that, in some cases, merchandise with one rough surface can be used for tiles or for adhering to a particular surface.

The witnesses gave somewhat varying definitions for the terms "dressed," "hewn," and "polished." Mr. Stephens stated that the word "dressed" refers to an operation at the quarry whereby the stone is cut roughly to a cubical shape with mallets and chisels. He said it is a sort of trimming to make a commercially usable shape and that, to his knowledge, it is not done to travertine slabs. Mr. Ryan testified that the term is used to signify a finished surface, a textured surface, and that it is done with a fine point chisel or similar tool. He distinguished between usage at the quarry, which means dressed to size or squared, and in the stone trade, where it refers to a finished surface. Dressed travertine is not much used in this country. Mr. Cater said the term meant ground down to a uniform thickness.

Mr. Stephens testified that the term "hewn" referred to a cutting or trimming operation; Mr. Ryan that it meant cutting to a particular size for a building or a monument; and Mr. Cater that it was an old-time wood carving process, where something is hewn down to

a particular shape. Mr. Ryan said the process was still used in Vermont but that it had practically been done away with in the trade because it was uneconomical.

According to Mr. Stephens, "polishing" means that, through the use of various abrasive materials, the stone is finished and a shine put on it. He said that dressing and hewing were not finishing operations but that polishing was. Mr. Ryan considered all of them to be finishing operations. Mr. Cater said that gang sawing was not a finishing operation.

The record in *C. J. Tower & Sons* v. *United States*, 24 Cust. Ct. 353, Abstract 53963, was incorporated herein. The evidence there was summarized by the court as follows (pp. 353–354) :

Competent and uncontradicted witnesses for the plaintiff testified that the imported condition of the travertine stone in question was not the result of hewing, dressing, or polishing, and that the evenness of the two faces was the result of a gang-sawing operation, in which a series of blades travel back and forth over the block of stone, and, in connection with a process using water and sand, in effect slice it into slabs of the thicknesses desired. It appears that travertine is taken from the earth in large blocks by dynamiting or band-sawing operations, and that the large blocks are gang-sawed into slabs of fairly even thicknesses as ordered.

   *      *      *      *      *      *      *

It is clear from the record that the quarried block is the crudest form in which travertine stone appears after separation from the earth. As to whether it ever appears in commerce in that form, the record is vague. The president of the importing company testified at one point—

    * * * They [the sellers] generally sell a block of the nearest size to what you are asking for. (R. pp. 22–23.)

and at another point—

    We order so many slabs, or we might order a block to produce certain slabs within a certain approximate size, so to produce slabs to approximate size. (R. p. 24.)

It appears that slabs, such as those at bar, are the next crudest form of travertine stone. Orders for slabs call for standard thicknesses, i.e., seven-eighths of an inch, 1 inch, 1¼ inches, etc., and for the approximate superficial area required. The thickness is not exact, but apparently any variation is on the side of excess thickness, rather than thinness. Thus, the illustrative exhibit, although said to come from a shipment in which the invoice calls for seven-eighths of an inch thickness, actually measures 1 inch in thickness. The excess is probably due to the fact that the dressing and finishing operations remove some of the surface. The edges of the imported slabs are always rough, and it appears that the invoice dimensions of each slab indicate the length and width of surface area which can be obtained from such slabs. Slabs are not necessarily ordered for specific jobs, but are frequently ordered for stock in standard thicknesses.

After importation, the slabs are cut to size for the particular job for which they are to be used, and then the surfaces are ground down (dressed), after which they are polished, as required.

This court held in that case that the travertine slabs involved were not manufactured and were dutiable under paragraph 234(b). It referred to *J. T. Steeb & Co., Inc.* v. *United States*, 16 Cust. Ct. 205, Abstract 50810, a case involving granite in which the court stated that the statutory terms "hewn," "dressed," "pointed," "pitched," "lined," and "polished" related to operations that dedicate granite to a definite size, shape, and condition, and that the succeeding generic phrase, "or otherwise manufactured," was limited in scope to those processes which were analogous to the ones specifically mentioned. The court, in the *C. J. Tower* case, *supra*, concluded (pp. 354–355):

Applying the foregoing reasoning to the situation at bar, it would appear that while it is true that the gang sawing of the quarried blocks into the imported slabs advanced the travertine by serving partially to fit it for its ultimate use, it nevertheless still left it only rough material upon which the operations which would dedicate it to definite size, shape, and condition were to be performed. The slabs, although sawn, were in no further advance condition than were the rough granite blocks involved in the *Steeb* case, and for the same reasons were "unmanufactured." * * *

Plaintiffs here place great reliance upon the cited *C. J. Tower* case, but a subsequent decision of the court of appeals reached the opposite conclusion on closely similar facts. *United States* v. *C. J. Tower & Sons*, 44 CCPA 1, C.A.D. 626. That case involved limestone slabs claimed to be classifiable as "unmanufactured, or not dressed, hewn, or polished." It appeared that limestone was quarried by a method known as "wedging," which resulted in large rectangular blocks of 10 to 15 tons in weight. These were gang sawed into slabs of standard stock thicknesses of $2\frac{3}{8}$, 3, 4, 5, $5\frac{1}{4}$, $5\frac{1}{2}$, 6, 7, and 8 inches. In filling an order, the producer selected a slab of greater thickness, length, and width than called for. After importation, the slabs were processed so that, in the finished piece, none of the surfaces of the slabs as they existed in their imported condition remained. The court, in its opinion, referred to the "rule of *ejusdem generis* (where particular words of description are followed by general terms, the latter refer only to things of a like class with those particularly described)" but rejected its application, stating (p. 6):

In the case at bar, the words "or otherwise manufactured" follow the more specific words "hewn," "dressed" and "polished." As has been discussed, the word "hewn," as it is used in relation to stone, refers to stone which has been roughly reduced to the dimensions desired. "Dressed" refers to stone which has been reduced to a specified finish and accurate dimensions. And "polished" has reference to a high degree of surface finish on the stone. The three words refer to different *degrees* of treatment and have no characteristic common to all of them from which may be inferred an intention on the part of Congress to restrict the effect of the general provision to any particular class of conditions. Thus, the rule of *ejusdem generis* has no applicability here. [Emphasis quoted.]

The court concluded that the limestone slabs were dutiable under paragraph 234(c) if they were "hewn, dressed, or polished" or "manufactured in any other way." It held that they were "manufactured," since to be classified as a material "manufactured," "it is only necessary that the article be so processed that it be removed from its crude or primary state, though it remain a variety of the original material." It held, further, that the processing was not merely one to facilitate transportation, stating (p. 8):

> \* \* \* Though the record indicates that the large blocks of limestone *as quarried* could not be conveniently transported, it seems inconceivable that the situation was such that the importer could only conveniently handle slabs which were sawn to within $\frac{3}{16}$–$\frac{1}{4}''$ of the ordered and $\frac{1}{2}''$ of the desired thickness dimension. The tolerances involved are too fine to support such a finding. It is our view, therefore, that the limestone slabs at bar have been "otherwise manufactured." [Emphasis quoted.]

The Treasury Department, before 1960, classified sawn travertine, evidently, as unmanufactured, but, on August 5 of that year, published a notice it would follow the contrary rule, with the 90-day saving clause, which is usual when a change in an established and uniform practice is involved. T.D. 55193 (1, 18). The Treasury evidently considered the earlier *Tower* case no longer authoritative in the circumstances, and we agree. No dependence can be placed on it as controlling herein.

The briefs of the parties debate again the issues decided in the second *Tower* case, 44 CCPA 1. The plaintiffs say they take "exception" to the appellate court's "conclusion that the three terms 'hewn,' 'dressed,' and 'polished' as applied to stone have no characteristic common to them all." They quote the same dictionary definitions which our appellate court considered, and say that they show that the three terms all refer to "finishing operations." They invoke the record currently made, and that in the incorporated case, only to show that gang sawing of travertine is not "finishing." It is not necessary to summarize the Government's argument, in view of the result we reach. Our analysis of plaintiffs' argument shows the discrediting of the second *Tower* case is indispensable to it and if that fails the protests fail.

Plaintiffs seem to assume *sub silentio* that we will review and in effect overrule a decision of our appellate court, and this we find a somewhat extraordinary assumption. It is true that different merchandise is involved, travertine instead of limestone, but the same tariff paragraph is to be interpreted and no significant difference is pointed out in the operation, rough cutting of slabs by means of gangsaws, which our appellate court held to be a manufacture. The record made before us contains no new evidence to justify a changed conclusion; rather, plaintiffs' witness Stephens interprets the words "dressed" and "hewn" as referring to other than finishing operations, contrary to

plaintiffs' brief, but in line with the argument of our appellate court. No decisions in collateral matters are cited which might justify an expectation that the holding in the second *C. J. Tower* case might not be adhered to. Nor is there alleged any degree of error such that it need only be pointed out to make correction mandatory. The issue as put before us is simply one of a difference of opinion about semantics such as literate people often indulge in.

In the circumstances, it would be supererogatory and presumptuous of us to take the decision of our appellate court under review and to announce whether we agree or disagree with the reasoning. So far as we are concerned, it is the law. However, we ought to point out that the normal reasons for applying the doctrine of *stare decisis* exist here with special considerations added. TSUS, schedule 5, items 513.71, 513.74, 514.21, 515.21, 515.51, and 515.54 now refer *eo nomine* to stone which is "sawed." The notes the Tariff Commission published on schedule 5 refer to the second *Tower* case, *supra*. Tariff Classification Study, November 15, 1960, pages 23 and 27 of schedule 5. This study also refers to the first *Tower* case, Abstract 53963, as a justification for the language then proposed for item 515.21: "Travertine, not hewn, not dressed, not polished, and not otherwise manufactured, but including slabs not further processed than sawed." (P. 6.) In the First Supplemental Report, dated January 1962, page 143, the language was changed to "Travertine, not hewn, not sawed, not dressed, not polished, and not otherwise manufactured," to conform to existing practice, T.D. 55193 (1, 18), which had evidently been changed because of the decision of the court of appeals in the second *C. J. Tower* case. This language was included in TSUS as they finally became law.

All of these notes lay before the Congress with the rest of the Tariff Commission report in the premises. They were part of the basis of the acceptance of the schedules by the Congress, and no doubt were also part of the basis of acceptance by foreign governments, parties to the General Agreement on Tariffs and Trade, T.D. 51802, who, of course, had to be shown wherein the new schedules altered rates set in the old ones. We believe, therefore, that, under the circumstances, the decision in the second *C. J. Tower* case, expressly referred to in the Tariff Classification Study, stands in a very special position so far as *stare decisis* is concerned, as will other decisions expressly referred to in the study.

For the reasons stated, we hold that the merchandise involved herein is properly dutiable, as assessed, at 21 per centum ad valorem under paragraph 234(c) of the Tariff Act of 1930, as modified, as stone suitable for use as monumental or building stone, not specially provided for, hewn, dressed, or polished, or otherwise manufactured. The protests are overruled, and judgment will be rendered for the defendant.