(C.D. 4003)

DOMESTIC MARBLE & STONE CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 23, 1970)

*Lamb & Lerch* (*Richard J. Kaplan* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Arthur H. Steinberg* and *Robert E. Burke*, trial attorneys), for the defendant.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judge

ROSENSTEIN, Judge: The merchandise involved herein consists of 10 travertine blocks imported from Italy in 1966 which were assessed in liquidation with duty at 21 per centum ad valorem under TSUS

item 515.24 which provides for travertine, hewn, sawed, dressed, polished, or otherwise manufactured, and suitable for use as monumental, paving, or building stone.

Plaintiff claims that the blocks are properly dutiable at 10.5 cents per cubic foot under TSUS item 515.21 as travertine, not hewn, not sawed, not dressed, not polished, and not otherwise manufactured.[1]

The relevant provisions read as follows:

Schedule 5, Part 1, Subpart C:

| | | Travertine and articles of travertine: | |
|---|---|---|---|
| [Claimed] | 515.21 | Travertine, not hewn, not sawed, not dressed, not polished, and not otherwise manufactured____ | 10.5¢ per cu. ft. |
| [Classified] | 515.24 | Travertine, hewn, sawed, dressed, polished, or otherwise manufactured, and suitable for use as monumental, paving, or building stone__ | 21% ad val. |

Defendant asserts in its brief, filed after submission of the case, that the term "sawed", as it appears in item 515.24, is in the absence of commercial designation to be construed in accordance with its common meaning and, as such, is applicable to the imported blocks which have one or more sawed surfaces. The government's argument is premised on the merchandise having been classified as travertine "sawed".

However, the record, including the official papers, does not disclose how the merchandise was classified under this item. As duty was assessed under a provision having more than one subproviso, at a rate provided for in at least two of them, without indicating under which one the assessment was made, there is no presumption that the merchandise was classified under any one of them and no presumption of correctness can attach. *Broadway-Hale Stores, Inc.* v. *United States*, 63 Cust. Ct. 194, C.D. 3896 (1969); *S. S. Kresge Co.* v. *United States*, 25 Cust. Ct. 89, C.D. 1269 (1950); *Sterling Button Co.* v. *United States*, 4 Cust. Ct. 213, C.D. 324 (1940), rehearing denied, 4 Cust. Ct. 524, Abstract 43931 (1940). Moreover, it is basic to our system of customs jurisprudence that an importer is entitled to be apprised of the classification of his merchandise. Of course, it remains plaintiff's bur-

---

[1] An alternative claim under TSUS item 515.31 was not pressed at the trial or in the brief and is hereby deemed abandoned.

den to establish that its claimed classification is correct and, if it fails to do so, the protest must be overruled.

Plaintiff called two witnesses, defendant none. The first witness was Malcolm S. Cohen, secretary-treasurer of the importing company, who has bought and sold stone products such as marble, granite, slate and travertine since 1935, and is familiar with the quarrying methods employed in the travertine quarries in Italy, including the Benedine quarry, the source of the stone at bar. He is also familiar with the processing of travertine in the mills of that country and of the United States.

All travertine quarries in Italy, the witness testified, employ the same quarrying methods: a large mass, usually in the area of 100 to 200 tons is loosened from the quarry mass by wire sawing which is "the most ancient of methods." The sawed mass is again wire sawed into smaller units which can be handled by the mechanical equipment. Using the "plug and feather" method [2] these pieces are split into blocks of a transportable size. The blocks are then trimmed by mallet, air hammer, wire saw or some other method to remove excess material, eliminate defects and obtain a "fairly squared up" block (R. 149). The witness described the process as follows (R. 58–59) :

> A. Well, the other operation is after you get these rough blocks into a size which you can handle, they are not always too regular in shape, and they are taken up on the bank of the quarry, depending upon the area of the quarry, if there is enough workable area left there, the workmen clean off the rough sides of the block, because otherwise you have an irregular shape, or a big bump, or irregular surface.. Quarry blocks don't come out like Swiss cheese. They come out with irregular size and corners and defects, and the workmen in the quarries normally make these blocks into a suitable block for export, or *for use in the mills*, and so forth. They don't move out of the quarry all of the material which is not really useable, or a waste to carry around, and this is done by hand, or by air hammer, or some such similar method. [Emphasis added.]

As a result of the wire cutting, the travertine blocks have at least one, usually two or three sides which are wire sawed. They are the "crudest" form of travertine bought and sold in the commerce of the United States.

The blocks are imported to be ultimately used for monuments or as building or paving stone. Unless a life-sized figure is to be used for a monument, the blocks are gang sawed into slabs after importation, as were the blocks at bar, and further finished. A slab must have at least six sawed sides before it can be used for the above named pur-

---

[2] This consists of hammering a steel wedge between two tapered pieces of steel that have been inserted into holes previously drilled in the mass (R. 57).

poses. Where a wire sawed face is retained after the block has been sawed into slabs, it is usually lost in the further finishing of the material.

Generally, a size and weight limit are given in the order for travertine blocks so that they can fit into the gang saw used at the mill. Although the dimensions of the blocks listed on the invoice indicate the amount of travertine paid for, they only approximate the actual size of the imported stone. The blocks at bar are oblong in shape, weigh from 7 to 11 tons and are listed on the invoice in dimensions varying from 7′7″ x 4′4″ x 2′11″ to 9′6″ x 4′1″ x 3′6″.

The second witness, Victor E. Citarella, who, as manager of its foreign marble division, buys and sells Italian travertine blocks, slabs, and finished products for the Georgia Marble Company of Atlanta, Georgia, is also familiar with the operations at the Benedine and other travertine quarries in Italy. Through the use of illustrative slides (collective exhibit 12), he described the quarrying procedures, in effect, corroborating Mr. Cohen's testimony on that point. He also described how the blocks were "shaped" and "cleaned", using slide 16 as an illustration of this process. Although taken in the Montenaro quarries near Rome it depicts "the very same things" he has seen in the Benedine quarry (R. 240). As the witness explained (R. 238)—

> A. This slide shows how the blocks are being shaped, given shape to the blocks, and also cleaning them. All blocks, before being taken away from a quarry, are cleaned, what we call cleaned of defects. All natural materials may have a certain amount of defects. Those defects are cleaned, are taken away from the blocks at the quarry, so when the blocks are pulled away from the quarry, you have the best possible commercial merchandise.

The "cleaning" was further detailed in the following exchange on cross-examination (R. 250–251):

> Q. Would you elaborate what you mean by cleaning for defects? Tell us exactly what was done.—A. If you have a block on which you have a crack, then the block is re-cut to take the crack out of the block.
> Q. How is it re-cut?—A. In that picture it is being done by hand with an axe.
> Q. What is another method of doing it?—A. Drilling. It might be done by wire sawing.
> Q. What is the purpose of that?—A. Because no buyer would buy a block with a defect, so if a block has a defect, what the producer does is actually reduce the block to a smaller size, but

clean the defect out. In other words, get rid of the defective area.

In addition to cleaning, the witness stated, the blocks "should always be shaped" roughly squared—

> In order to reduce waste, in order not to pay duty, and not to pay transportation on something which is not later used in the shop. [R.258.]

Plaintiff contends that the word "sawed" is not to be taken literally in its common meaning, as the government maintains, but should be considered in the context of the provision for "travertine * * * sawed * * * or otherwise manufactured * * *"; and that, construed in this light, the term applies, not to a basic quarrying operation which produces blocks suitable for shipment, but to a manufacturing process which advances the merchandise beyond its crude quarried state. Moreover, plaintiff urges, the judicial and legislative history of the travertine provision indicates that "sawed" refers to *slabs* gang sawed from a block, not to the block itself.

In *C. J. Tower & Sons* v. *United States*, 24 Cust. Ct. 353, Abstract 53963 (1950), travertine slabs gang sawed from blocks into standard stock thicknesses were held to be dutiable under paragraph 234(b), Tariff Act of 1930, as "travertine stone, unmanufactured, or not dressed, hewn, or polished", the court stating:

> Applying the foregoing reasoning to the situation at bar, it would appear that while it is true that the gang sawing of the quarried blocks into the imported slabs advanced the travertine by serving partially to fit it for its ultimate use, it nevertheless still left it only rough material upon which the operations which would dedicate it to definite size, shape, and condition were to be performed. The slabs, although sawn, were in no further advanced condition than were the rough granite blocks involved in the *Steeb* case, and for the same reasons were "unmanufactured." * * *

However, our appellate court adopted a contrary view in *United States* v. *C. J. Tower & Sons*, 44 CCPA 1, C.A.D. 626 (1956), which involved limestone slabs gang sawed into standard stock thicknesses ranging from 2⅜ to 8 inches and so treated after importation that, when finished, none of the surfaces of the slabs remained as they had existed in their imported condition. The court rejected the importer's contention that the slabs were "unmanufactured, or not dressed, hewn, or polished" within the meaning of paragraph 234(c), and held that they were "otherwise manufactured" within the meaning of the provision in that same subparagraph for "* * * limestone * * * suitable for use as monumental or building stone * * * hewn, dressed, or polished, or otherwise manufactured, * * *." The court stated:

\* \* \* While to constitute an article a manufacture, it may be necessary to convert the article into an entirely different article, it is only necessary that the article be so processed that it be removed from its crude or primary state, though it remain a variety of the original material, to be manufactured. (See *Nippon* case, *supra*, and other cases cited therein.)

This rule is tempered, however, by the rule that an article will not be excluded from classification as "unmanufactured" by reason of its having been subjected to a manufacturing process designed solely to prepare the article for shipment, even though such preparation incidentally advances the article for its intended use. *Lackawanna Steel Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 93, T.D. 38359.

The court also noted that, unlike the situation in the *Lackawanna* [3] case, *supra*, sawing of the limestone blocks into slabs obviated the need for any like operation by the operator. Furthermore, it did not agree that the slabs were sawn solely to facilitate transportation, as claimed, observing:

\* \* \* Though the record indicates that the large blocks of limestone *as quarried* could not be conveniently transported, it seems inconceivable that the situation was such that the importer could only conveniently handle slabs which were sawn to within $\frac{3}{16}$–$\frac{1}{4}''$ of the ordered and $\frac{1}{2}''$ of the desired thickness dimension. The tolerances involved are too fine to support such a finding. it is our view, therefore, that the limestone slabs at bar have been "otherwise manufactured." [Emphasis copied.]

Subsequent to the second *Tower* decision, the Treasury Department issued a change of practice ruling, August 5, 1960, published in T.D. 55193(1), stating that, after 90 days, travertine slabs gang sawed from a block, cut to a definite thickness such as $\frac{7}{8}$ inch, and suitable for use as monumental or building stone, would be classified under paragraph 234(c) as monumental or building stone, not specially provided for, otherwise manufactured than hewn, dressed, or polished.

The Tariff Commission also took cognizance of that decision in revising the tariff schedules. The Explanatory Notes in the *Tariff Classification Study*, November 15, 1960, state, in Schedule 5, pages 23 and 27, that the term "sawed" was added to items 514.21 and 514.24 (limestone) and 515.51 and 515.54 (stone, not specially provided for) in line

---

[3] *Lackawanna* involved limestone crushed to diameters of $\frac{3}{16}''$–4'' to facilitate transportation and requiring further manufacturing processes before it was usable. The merchandise was held to be free of duty under the Tariff Act of 1913, the court stating:

\* \* \* These importations however, are not so ready for ultimate use. On the contrary, they must undergo several processes, *including* a preliminary one of crushing, before they are made ready for ultimate use. [Emphasis copied.] The record clearly establishes that the crushing at the quarries for the purposes of transportation *does not supersede and render unnecessary crushing at the destination of and for final use.* \* \* \* [Emphasis added.]

with the ruling in C.A.D. 626. However, the proposed language of items 515.21 ("travertine, not hewn, not dressed, not polished, and not otherwise manufactured, but including slabs not further processed than sawed") and 515.24 (which omitted the term "sawed") followed the ruling of the first *Tower* case, Abstract 53963. Both items were revised to their current language in the *First Supplemental Report*, January, 1962 (and adopted by Congress in the Tariff Classification Act of 1962) in order, the *Report* explains, at page 143, citing T.D. 55193(1), to bring the provisions into conformity with existing practice.

In *Quality Marble & Granite Co. et al.* v. *United States*, 55 Cust. Ct. 362, C.D. 2602 (1965), holding the second *Tower* case to be *stare decisis* of the issues, the court affirmed the classification of travertine slabs, gang sawed from blocks into approximate ordered thicknesses, under paragraph 234(c) as "* * * other stone * * * otherwise manufactured", rejecting the claim that they were "unmanufactured".

Turning to item 515.24, we are in accord with plaintiff that "sawed" as used therein does not apply to a basic quarrying operation which produces the crudest form of travertine suitable for shipment in commerce, albeit incidentally advancing the material, *Lunham & Moore* v. *United States*, 57 Treas. Dec, 244, T.D. 43849 (1930), but to a process which advances the stone from its original crude state and renders it a material manufactured. *United States* v. *C. J. Tower & Sons*, C.A.D. 626. With the inclusion of the phrase "or otherwise manufactured", item 515.24 plainly speaks to the processes specified therein as manufacturing operations.

We do not, however, adopt plaintiff's argument that the term "sawed" is limited to slabs. Although the inclusion of "sawed" in the revised item 515.24 may have been in line with a Treasury ruling which followed a court decision relating to sawed slabs, it was the principle of that decision which was given expression in the changed language, not the specific merchandise under protest. Indeed, it would be wholly inconsistent, in the absence of restrictive language, to limit the term "sawed", and not the other process named therein, to a particular form of travertine. If Congress had intended to limit this term to slabs, it could have done so by inserting in the revised item 515.24 the phrase employed in the original proposed item 515.21, viz., "including slabs not further processed than sawed." The exclusion of such phrasing bespeaks an intent contrary to that urged by plaintiff.

Following the guidelines laid down by our court of appeals in the second Tower case, we must address ourselves to whether the blocks at bar were sawn and otherwise treated solely to prepare them for shipment or whether, as a result of the processes performed thereon,

they have been removed from their crude or primary state though remaining a variety of the original material.

The removal of the travertine from the quarry mass and the reduction of the stone into commercial sizes suitable for transportation did not render the blocks "sawed" within the intendment of item 515.24. From the standpoint of cutting to size only, the wire sawing did not advance the travertine any further than it would have been advanced if it had been removed from the quarry by other means. See *Gould Monument Works v. United States*, 44 Cust. Ct. 107, C.D. 2160 (1960).

But we do not agree that the "squaring off" and trimming of the blocks, *after* reduction to shipment dimensions, whether by wire sawing or other means, did not constitute an advancement in condition of the travertine from its basic crude state, or that it was essential to shipment of the merchandise. See *Westchester Aquarium Supply Co.* v. *United States*, 36 Cust. Ct. 146, C.D. 1767 (1956).

The shaping of the stone, elimination of defects, and removal of excess waste were as important to the purchaser as taking delivery of blocks in sizes which would fit into the gang saw. Plaintiff's witnesses were explicit on this point, as shown by their statements quoted in our summary of the record, *supra*, and in the following exchange on cross-examination of Mr. Citarella (R. 251)—

> Q. I believe you also testified that the cleaning was to put the blocks in the best possible, make the blocks the best possible merchandise, I believe that was your description?—A. Yes.
>
> Q. What did you mean by that?—A. No buyer is interested in buying blocks of irregular shape, because of the waste factors involved. You are not interested in paying freight, in paying duty on merchandise that you will not be able to use, so that is why the blocks are shaped, I believe that is the term I used, and cleaned of defects, and shaped into commercial size, shapes, and sizes.

and on redirect examination (R. 258)—

> Q. The block in the foreground on slide 16, on which the man is working?—A. Rectangularly shaped block.
>
> Q. Does it have 90 degree angles, sides at 90 degree angles?—A. It probably has, close to it, but not exactly. That is the way the blocks should always be shaped.

The shaping and cleaning, or trimming, processes were significant steps in advancing the blocks toward their intended use and in putting them in appropriate condition for the next stage of manufacture. Unlike the crushed limestone in the *Lackawanna* case, the cleaning and shaping at the quarry rendered these processes unnecessary at the mill, thus effecting a saving in time and money to the manufacturer, who received merchandise with a squared up shape free and clear of

wasteful defects and immediately suitable for cutting into slabs. Clearly, the processing described by the witnesses herein was not done solely to facilitate transportation but advanced the blocks in condition thus removing them from their crude or primary state.

The processing herein is somewhat akin to that done in *David M. Studner* v. *United States*, 62 Cust. Ct. 63, C.D. 3679, 295 F. Supp. 289 (1969), wherein used print rollers, imported with one end sawed off in a straight cut in accordance with the importer's specifications, were claimed dutiable as waste. The government's position was that the sawing, done to specification and order, advanced the print rollers toward a new intended use and that such advance resulted in a partly manufactured article, not specially provided for, classifiable under paragraph 397, Tariff Act of 1930. Citing the importer's testimony agreeing that the buyers "needed the straight cut on one end", the court found that the straight cutting was not done solely for convenience in shipping, but advanced the rollers toward their intended use and affirmed the classification.

In *Chas. H. Demarest, Inc* v. *United States*, 44 CCPA 133, C.A.D. 650 (1957), palmyra stalks and fiber which, prior to importation had been sorted, bundled, and trimmed so that the merchandise was reduced to uniform as well as to the approximate ordered lengths, were classified as manufactured fibrous vegetable substances under paragraph 1558, Tariff Act of 1930. Appellant claimed that the processes used by the foreign supplier were employed solely to place the material in a condition convenient and economical for shipment and manufacture; that the merchandise was not changed in condition nor advanced toward its ultimate use; and that it was free of duty pursuant to paragraph 1684 of said Act as fibrous vegetable substances "not dressed or manufactured in any manner." The appellate court disagreed, stating—

> * * * The trimming operation, however, was not performed merely to "cleanse the material desired" and to free "it from impurities," or to "get it by itself," as stated in the *Cone* case. Nor was it performed solely to prepare the article for shipment, as in the *Lackawanna* case. Even in the absence of Smith's testimony, which clearly sets forth the fact that the fiber and stalks were trimmed to the *exact lengths* ordered, we are constrained to conclude that more was done to the merchandise than merely trimming for purposes of packing and shipping. How can we reconcile Demarest's statements to the effect that from 8 to 10 inches of the unusable portion of the stalks were trimmed off and that the fiber and stalks were trimmed to the approximate ordered lengths with appellant's contention that the trimming merely facilitated packing and shipping? How, also, can we reconcile this contention with the testimony of Werheim to

the effect that the imported lengths of stalks were such that only ½ inch of stalk had to be trimmed at the final trimming step and that longer lengths would "stick out too far" and necessitate running them "too often through the trimmer"? Clearly, the trimming operation more than "incidentally" advanced this merchandise in condition for its intended use; the *trimming step was obviously designed to bring the fiber and stalks one step closer to their final form and was clearly a manufacturing step.* * * * Nor is it relevant that 5% of the fiber and stalks had to be discarded as unfit for use or that a subsequent trimming operation was necessary to equalize the lengths of the fiber and stalks after insertion into the broom and brush blocks. *The final trimming operation would not have obviated the necessity for a preliminary "trimming" operation to reduce the fiber and stalks to the approximate lengths desired.* Such preliminary trimming was essential to the proper and efficient production of brushes and brooms, as was indicated by Werheim. It would be a different case indeed if the trimming merely resulted in a bundle desirable for packing and shipping purposes and a subsequent trimming to desired length were performed in the United States prior to the insertion of the stalks and fiber into the blocks. In such a case this importation would fall squarely within the bounds of the *Lackawanna* case, *supra*, and would not be deemed manufactured. [Emphasis supplied.]

The shaping and cleaning herein, like the trimming operation in *Demarest*, obviated the need for any like operation by the importer: these were manufacturing steps. Therefore, regardless of the method used in processing the blocks at the quarry site, they were "otherwise manufactured" within the ambit of item 515.24.

We note plaintiff's contention that, as the instant merchandise represents the "crudest" form in which travertine is imported into the United States, it must be "unmanufactured" for tariff purposes. However, the fact that shaped, cleaned blocks may be the crudest form in which travertine has been imported up to the present time does not prove that the stone could not be imported in a less advanced condition, that is, in its primary, crude, quarried state. *United States* v. *Charles H. Demarest, Inc.*, 45 CCPA 109, C.A.D. 682 (1958); *Associated Manufacturers Importing Co. et al.* v. *United States*, 50 Treas. Dec. 339, T.D. 41818 (1926).

The remaining question before us is whether the blocks at bar are suitable for use as monumental, paving, or building stone.

In *Kahlen* v. *United States*, 2 Ct. Cust. Appls. 206, 208, T.D. 31947 (1911), our appellate court, in passing on the suitability of onionskin paper for printing purposes under paragraph 402 of the Tariff Act of 1897, stated:

* * * From the fact that a thing may be used or has been used for a particular end it does not necessarily follow that it is com-

mercially suitable therefor, and evidence of a casual, incidental, exceptional, or possible use of a thing can not be accepted as proof of its suitability for such use. A house may be built of ice or of paper, but in this country at least such materials would hardly be regarded as suitable building materials. A thing to be suitable, as that term is commonly understood, must be fit and appropriate for the end to which it is to be devoted. In the tariff law the term "suitable" means actually, practically, and commercially fit. * * *

See also *Keer, Maurer Company* v. *United States*, 46 CCPA 110, C.A.D. 710 (1959). Suitability for use implies a commercial suitability in the condition imported. *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T.D. 37222 (1917).

Thus, the imported material is not suitable for use as monumental, building, or paving stone if it has been "adapted for another and distinct use", as in the case of the granite pieces involved in *K. M. Kubierschky* v. *United States*, 5 Cust. Ct. 143, 145, C.D. 386 (1940), which were shaped, and fitted for use after assembly only as a bromine tower; and of the dressed lava stones the subject of *Manufacturers' Paper Co.* v. *United States*, 3 Ct. Cust. Appls. 72, T.D. 32353 (1912), and of *United States* v. *Manufacturers' Paper Co.*, 4 Ct. Cust. Appls. 110, T.D. 33390 (1913). In the second *Manufacturers' Paper Co.* case, the court observed that lava stone *per se* is not in all cases a monumental or building stone, "and it appears that in their condition as imported they are not fit for or designed to be devoted to such uses."

The record herein establishes that travertine blocks are used for monumental, building, or paving purposes, either in block form for life-sized monuments or, as in the case of the subject merchandise, after being gang sawed into slabs: no other use is even suggested. The intermediate gang sawing operation advanced them toward their intended use. It is clear that the blocks were not only fit for, but "designed to be devoted to such uses", *United States* v. *Manufacturers' Paper Co.*, T.D. 33390, and, accordingly, were "suitable for use as monumental, paving, or building stone" within the meaning of item 515.24.

We have considered the cases cited by plaintiff. Upon the record herein and for the foregoing reasons we find and hold that the merchandise in controversy is properly classifiable under TSUS item 515.24 as "travertine, * * * otherwise manufactured, and suitable for use as monumental, paving, or building stone".

The claim under item 515.21 is overruled, and the claim under item 515.31 is dismissed.

Judgment will be entered accordingly.