**INTERNATIONAL SEAWAY TRAD-
ING CORP.**

v.

**UNITED STATES.**

C.D. 4375; Protest No. 66/64681–4599–66
against the decision of the collector of
customs at the port of New York.

United States Customs Court,
First Division.

Sept. 12, 1972.

Sharretts, Paley, Carter & Blauvelt, New York City (Charles P. Deem, New York City, of counsel), for plaintiff.

E. Grey Lewis, Acting Asst. Atty. Gen. (Herbert P. Larsen and Harold L. Grossman, New York City, trial attys.), for defendant.

Lamb & Lerch, New York City (Richard J. Kaplan, New York City, of counsel), amicus curiae.

Before WATSON, MALETZ, and RE, Judges.

MALETZ, Judge:

This case presents the question as to the proper tariff classification of footwear imported from Hong Kong that was described on the invoice as "Basketball High Shoes". The imported footwear was classified under item 700.60 of the Tariff Schedules of the United States as "[f]ootwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics * * *" and assessed with duty at the rate of 20 percent ad valorem.

Plaintiff claims that this classification is erroneous and contends that the footwear is properly dutiable at 15 percent ad valorem under item 700.70 as "[f]ootwear * * * [w]ith soles of material other than leather: [w]ith uppers of vegetable fibers".

The pertinent provisions of the tariff schedules read as follows:

Classified under:

Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or, over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

*　　*　　*　　*　　*　　*　　*

　　Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):

*　　*　　*　　*　　*　　*　　*

700.60　　Other ............... 20% ad val.

Claimed under:

Footwear, with uppers of fibers:

*　*　*　*　*　*

　With soles of material other than leather:

700.70　　With uppers of vegetable fibers ............. 15% ad val.

Schedule 4, Part 4, Subpart B:

Subpart B headnotes:

1. This subpart covers all rubber whether or not obtained, derived, or manufactured in whole or in part from any product described in part 1 of this schedule.

2. For the purposes of the tariff schedules, the term "rubber" means a substance, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking can be stretched at 68°F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150 percent of its original length, and includes such substance whether or not containing fillers, extenders, pigments, or rubber-processing chemicals.

At a pretrial conference, the parties entered into the following stipulation:

1. The uppers are of vegetable fibers.

2. The footwear is in no part of leather.

3. The midsoles of the instant footwear contain, as components, among other things, "Natural Rubber RSS" and "Synthetic Rubber". That "Natural Rubber RSS" and "Synthetic Rubber" are substances, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking, can be stretched at 68°F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes

to less than 150% of its original length.

4. Both parties agree to be bound by a determination by the Customs Laboratory as to whether the vulcanized so-called iron powder midsole material can be stretched to three times its original length.[1]

5. Defendant's Collective Exhibit 'A' [a Customs Laboratory Report which was received in evidence without objection] is correct in its determination of the relative weights of the respective materials insofar as they were therein determined.

The Customs Laboratory Report thus referred to states in relevant part:

The midsoles in their present condition (containing the iron powder) are not capable of being stretched to three times their original length. In our opinion the rubber hydrocarbon of the midsole would conform to the physical requirements of the term "rubber" as defined in Headnote 2, Subpart B, Part 4, Schedule 4 of TSUSA 1969.

The weight of each sneaker minus the lacing was found to be 272 grams (left sneaker) and 283.5 grams (right sneaker). The midsoles were found to weigh 156.5 grams (left sneaker) and 169.2 grams (right sneaker). Three tests on the midsole of the left sneaker showed an average of 89% by weight of iron and iron oxide. This is equivalent to 51.2% by weight of the left sneaker minus the lacing. Assuming 89% by weight of iron and iron oxide in the right midsole, the right sneaker minus the lacing contains 53.1% iron and iron oxide.

\* \* \* \* \* \*

Three tests on the midsole of the right sneaker showed an average of 89.5% by weight of iron and iron oxide. This is equivalent to 53.4% by weight of the right sneaker minus the lacing.

Against this background, the issue is whether the midsole material—which, according to the Customs Laboratory Report, constitutes over 50 percent by weight of the imported footwear—consists solely of "rubber" as defined in headnote 2, schedule 4, part 4, subpart B. If it does, the parties agree that the classification of the footwear under item 700.60 must be upheld. On the other hand, if, as contended by plaintiff, (1) the midsole material consists of approximately 10 percent by weight of "rubber" as defined in headnote 2 and approximately 90 percent by weight of iron powder, or (2) is a "rubber compound" but not "rubber", the classification must fall and the protest be sustained. Thus, resolution of the present controversy turns upon the interpretation of the term "rubber" as defined in headnote 2, schedule 4, part 4, subpart B.

We turn now to the record which, in addition to the stipulated matters set out above, consists of the testimony of two witnesses called by defendant, and assorted exhibits. The first witness, Joseph H. Fischer, who was employed originally as a chemist and is now a footwear specialist with Uniroyal, Inc., a domestic manufacturer of rubber and canvas footwear and sponge rubber products, testified that he is primarily responsible for the process development of rubber compounds prior to their fabrication into rubber products; and that he has practiced in the field of rubber chemistry for 23 years.

Henry S. Anthony, the second witness, who is chief chemist of the Tyer Rubber Division of the Converse Rubber Co., a domestic company, stated that he holds a degree in chemistry, has taken courses in rubber chemistry and technology, and has been in rubber technical work since 1937. He heads the laboratory at Tyer where he is in charge of the technical work, including compounding, quality development and testing, chiefly of rubber products.

---

1. At the trial, the parties agreed that the midsoles referred to in paragraph 4 of the stipulation have been, in fact, vulcanized or otherwise cross-linked.

According to the testimony of these witnesses, there are many "crude" natural and synthetic rubbers which come in latex (natural) form, and in bales, crumbs or sheets. Rubber molecules are basically hydrocarbons capable of being vulcanized[2] or cross-linked, and are known as rubber polymers or elastomers. Elastomers are vulcanized commercially by means of curing or vulcanizing agents which consist of chemicals such as sulphur, peroxide or metal oxides that bind the rubber molecules together, i. e., perform the cross-linking. No rubbers are made commercially with only the elastomer and curing agent as ingredients. Accelerators or activators, known as curing aids, are also used to speed up the process, and an antioxidant is generally added to protect the product from aging. The vulcanized or cured rubber is known as a "rubber compound" or "elastomer compound".

The term "filler" refers to two classes of material: the reinforcing types, such as carbon black, which "actually enhance the rubber compounds, they give you better tensiles, better abrasion, make a product wear better"; and extenders which "[d]egrade the product: * * * make it cheaper." (R. 25) These ingredients are mixed together prior to vulcanization or curing.

The specific properties and characteristics of a rubber compound depend upon the type and quantity of fillers and other ingredients which are added to the elastomer and curing agent. Thus, if it is desired to make the compound light, a filler such as cork is added; to make the compound stiff, various types of resins are added; to make the compound heavy, fillers such as lead oxide are used. In short, the vulcanized product might be light, hard, soft, spongy, pigmented, or abrasion-resistant, and will vary in elasticity according to the fillers and pigments it contains.[3] The elasticity can also be changed to a lesser extent by the curing or vulcanization system used.

All crude elastomers, with the necessary curing agents and accelerators, can, without the addition of fillers or extenders, pass the statutory stretch test of headnote 2. But the fillers, extenders, pigments and rubber processing chemicals used may affect the vulcanized compound's ability to pass the test. However, regardless of the degree of elasticity, if a vulcanized product contains an elastomer or rubber polymer, it is referred to in the industry as "rubber", "rubber compound", "elastomer" or "elastomer compound".

Both witnesses produced various samples of vulcanized materials which they characterized as "rubber" or "rubber compounds", and, in the case of an industrial sponge (Exhibit B–4), as a "finished rubber compound product", although not all could pass the statutory stretch test.[4] They considered these

2. "Vulcanization" is defined in the Condensed Chemical Dictionary (5th ed. 1956) as a—
 Process of combining rubber with sulfur or certain other additives under the influence of heat and pressure to eliminate tackiness when warm and brittleness when cool, and to otherwise improve the useful properties of rubber, such as strength, elasticity and abrasion resistance.

3. The witness Anthony explained (R. 145):
 * * * The typical rubber compound consists of the elastomeric base ingredient, to which is added the necessary ingredients for vulcanization plus the ingredients to achieve the specific

characteristics which you are trying to produce.

4. A "rubber compound", Fischer stated, "would be used in a finished product" (R. 62–63): the distinction between "rubber" and "rubber compound", he noted, " * * * [is] a very fine distinction, if there is one." (R. 65) Although rubber cement is "rubber" or a "rubber product", it is bought in the shoe industry as "rubber cement", not "rubber". (R. 73) Anthony testified that the term "rubber" is not one of precision within the industry; it refers to "crude", "unprocessed", "compounded", and even to "finished" rubber. (R. 144) Although he described collective exhibit C, consisting of three "rubber covered rolls for

products to be rubber "[b]ecause the material which binds the whole mass together is rubber."[5] (R. 102; see also R. 61)

The ingredients contained in the midsoles of the imported shoes which are listed on the invoice accompanying the entry papers were characterized by both witnesses as a "rubber compound".[6]

In connection with the production of synthetic rubbers, Fischer testified that his company manufactures, in combination with a Texas oil firm, a synthetic styrene-butadiene rubber called "Synpol". For all intents and purposes, Fischer testified, neither this rubber nor the natural rubber purchased by his company contains fillers, extenders, pigments or rubber-processing chemicals.

However, Anthony testified, in the following exchange on cross-examination, that a "large amount" of "crude" styrene-butadiene (SBR) rubbers produced by the oil companies does contain fillers (R. 147):

Q. When crude rubber, either natural or synthetic, moves in commerce, does it not sometimes contain such things as pigments or fillers?

A. Well * * * [t]he manufacturers of SBR, the styrene butadience [sic] rubber, you see in many cases they are the big oil companies, and they are the companies that also, in some cases, manufacture carbon black, because they have oil and natural gas available, and they obviously produce oil, so *there is a large amount of S.B.R. which is manufactured with carbon black and*

oil in conjunction with the S.B.R. elastomer, and that is sold under the name of a master batch.

Q. By number?

A. Yes. By many numbers, yes.

Q. Now, that master batch, is that capable of being cross-linked and then—as is, with the addition of sulphur—being cross-linked and then fitting the stretchability and return test that we have covered previously?

A. Yes.

Q. What would you characterize that carbon black as? Is it a filler?

A. As a *reenforcing* filler. [Emphasis added.]

As we have seen, the issue in this case is whether the midsole material—which constitutes over 50 percent by weight of the imported shoes—is "rubber" as defined in headnote 2. With respect to this issue, each party draws differing legal conclusions from the following facts which are not in dispute: (1) The imported footwear is in no part of leather and has uppers of vegetable fiber; (2) the midsoles contain as components, among other things, approximately 10 percent by weight of natural and synthetic rubbers which would conform to the physical requirements of "rubber" as defined in headnote 2; (3) the midsoles also contain, as components, approximately 89 to 89½ percent by weight of iron and iron oxide (iron powder) which constitute over 50 percent by weight of each shoe; (4) the midsoles in their finished condition do not meet the stretch test of headnote 2; and (5) the iron powder component is neither rubber, plastic nor vegetable fiber.

---

the paper industry" as "rubber" (R. 93), this merchandise is not ordered as "rubber" but as a "rubber roll". "No, he [the customer] doesn't want rubber, he wants a rubber roll that he can put in his paper machine." (R. 146)

5. Anthony explained (R. 110) :
 The rubber, when it's processed, becomes relatively soft, and the ingredients which are added to it either dissolve in the rubber or are encapsulated by the

rubber, surrounded by the rubber—wet by the rubber, if you want to put it in that term—and that's why it's a rubber compound.

6. According to the invoices, the midsoles are composed of "Natural Rubber", "Synthetic Rubber", "Stearic Acid", "Zinc Oxyde" [sic], "Sulphus" [sic], "Antioxydent" [sic], "Acceralator DM" [sic], "Acceralator D" [sic], and "Iron Powder".

In this setting, plaintiff, describing the midsole material as a "large amount of iron powder held together by [a] small amount of rubber acting in a sense, as a cement" (br. 9), contends that the iron powder is a separate constituent of the shoes and not part of the "rubber" of the midsoles since the mixture or compound formed by combining approximately 10 percent natural and synthetic rubber with 90 percent iron powder is not " 'such substance' as is capable of being stretched to 3 times its length, etc., after cross-linking or vulcanization." According to plaintiff, to meet the headnote 2 definition of "rubber", the substance under consideration must in crude form be capable of being cross-linked or vulcanized, and thereafter be capable of meeting the stretch and return tests specified in headnote 2, whether or not it contains fillers, extenders, pigments or rubber-processing chemicals. · Therefore, says plaintiff, even if the midsole material were considered to be a rubber compound because of the 10 percent rubber or elastomer content, it would not be rubber per se because of its inability to meet the stretch and return tests.

Defendant, on the other hand, claims that headnote 2 is clear and unambiguous and that the tests for "rubber" set out therein apply only to the "crude" substance, natural or synthetic rubber, when imported in bale, crumb, powder, latex, or other crude form. As to the imported midsoles, defendant's position is that to constitute "rubber" within the meaning of headnote 2, it is only necessary that the substance used in the manufacture thereof be a natural or synthetic rubber, such as would meet the prescribed stretch and return tests—whether or not compounded by incorporating therein fillers, extenders, pigments or rubber-processing chemicals. In other words, defendant's position is that if the substance in crude form is itself capable with a curing agent of being cross-linked and of meeting the stretch and return tests, any compound containing

such substance is "rubber" even if the compound itself does not meet the prescribed stretch and return tests. Thus, defendant contends that the midsoles in question are "rubber" within the meaning of headnote 2 because they contain as components, among others, elastomers which in crude form were capable of being cross-linked, and thereafter meeting the necessary stretch and return tests.

A brief filed by amicus curiae agrees with defendant's interpretation of headnote 2 but, in support of its position, relies heavily upon the legislative history of the rubber definition as set out in the *Tariff Classification Study*, Nov. 15, 1960, Schedule 4 (hereafter *"Study"*). That *Study*, as amicus notes, contains the original proposed schedule 4 which was released by the Tariff Commission on February 7, 1958, together with a notice of public hearings to be held thereon. In this connection, the headnote to subpart B, part 4, of the proposed schedule, as originally drafted, read as follows (*Study*, p. 247):

*Subpart B headnote:*

1. The term "rubber", in this subpart, means a substance in bale, crumb, powder, latex, or other crude form, whether or not containing fillers, extenders, pigments, or rubber-processing chemicals, which can be vulcanized or similarly processed into materials which can be stretched at 68° F. to at least twice their original length and which, after having been so stretched and the stress removed, return with force to approximately their original length.

This proposed definition, amicus concedes, would have made the vulcanization, stretch and return requirements applicable to a substance in crude form, with or without additives fillers, extenders, etc.) ; hence, according to amicus, only those rubber compounds which were themselves capable of meeting the stretch tests would have been "rubber" for tariff purposes.

The final version of this headnote (re-numbered headnote 2), as enacted by Congress, reads (as quoted previously):

> 2. For the purposes of the tariff schedules, the term *"rubber"* means a substance, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking can be stretched at 68° F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150 percent of its original length, and includes such substance whether or not containing fillers, extenders, pigments, or rubber-processing chemicals.

Thus, in the final version of the head-note, the Tariff Commission (besides revising the physical requirements) changed the sentence structure by placing the "whether or not containing fillers * * *" clause at the end of the definition as part of the phrase "and includes such substance * * *."

This change in sentence structure, amicus argues, is indicative of an intent by the Tariff Commission to limit the specified stretch and return tests to elastomers (rubber in crude form) not containing fillers, extenders, etc., and to include within the definition of "rubber" elastomers containing fillers, extenders, etc. Stated otherwise, amicus contends, if the elastomer meets the stretch test, it is "rubber" and does not cease being "rubber" when fillers, extenders, etc. are added. Thus, in the view taken by amicus, it is irrelevant under the revised headnote whether or not a rubber compound can meet the specified stretch and return tests if it contains an elastomer which can.

However, as we read headnote 2—particularly in the context of the relevant legislative history—we cannot agree with this or with defendant's interpretation of headnote 2. To the contrary, as we construe headnote 2, it refers to a substance in *crude form* (*not* a "crude" substance) which (a) can be cross-linked and, after cross-linking, (b) meet the specified stretch and return tests; and it specifically includes, as subject to these requirements, all substances in crude form whether or not containing fillers, extenders, pigments or rubber-processing chemicals. In brief, in our view, the term "rubber", for purposes of the tariff schedules, includes all substances in crude form, whether or not containing fillers, extenders, pigments or rubber-processing chemicals, which are capable of being cross-linked and of meeting the requisite stretch and return tests. This construction, we think, comports not only with the plain meaning of the language but with the express intent of the Tariff Commission which had been charged with the responsibility of revising and consolidating the tariff classification schedules.

As indicated in the Explanatory Notes and correspondence published in the previously referred to *Study*, the Commission was concerned with formulating a definition of rubber that would include, in addition to natural rubbers, those synthetic materials which were recognized by the industry and the Bureau of Customs as synthetic rubber, and which were being classified as such by the Bureau under paragraph 1558, Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (T.D. 51802).[7] See *Study*, p. 100. In formulating such a definition, the Commission was advised that it was important to recognize the distinguishing characteristics of rubber—i. e., cross-linking, elongation and reversible recovery capabilities—which would include synthetic rubbers that do not possess the properties of extensibility and retraction to the same degree as natural rubber, but

---

7. Under GATT, a provision for "synthetic rubber and synthetic rubber articles" had been carved out of paragraph 1558 which provided for raw or unmanufactured and manufactured articles, not specially provided for.

would exclude resins and other materials. See *Study*, pp. 421–22. See also generally *Study*, pp. 408–35.[8]

Following hearings held in March 1958 on proposed schedule 4 (*Study*, p. 302 et seq.), the Tariff Commission's legal staff held informal meetings and also corresponded with representatives of Polymer Corp. Ltd. of Sarnia, Canada, a large manufacturer and exporter of synthetic rubber, in order to settle upon a definition of rubber that (1) would contain less stringent stretch and permanent set requirements than were originally proposed; and (2) would ensure that definition's applicability to recognized synthetic rubbers having lower permanent recovery capabilities such as Polymer's "Polysar SS–250", but would at the same time effectively screen out plastics and other non-rubber materials. *Study*, pp. 408–35.[9]

The final version of the headnote definition (aside from the reference to cross-linking) adopted Polymer's recommended return test of "less than 150 percent" of the substance's original length after elongation. The Commission's almost total preoccupation with this aspect of the "rubber" definition is emphasized in the Explanatory Notes, as follows (*Study*, pp. 100–01):

Subpart B covering rubber has had substantial modifications made in its provisions since being published for public hearings. These modifications are reflected in headnotes 1 and 2 of subpart B * * *.

The modifications reflected in headnotes 1 and 2 are primarily the result of further review of the customs practice of admitting certain coal-tar synthetic rubbers which are copolymers of styrene and butadiene under the provision for "synthetic rubber" in paragraph 1558 of the Tariff Act of 1930, as modified. At the time schedule 4 was published for hearings, this practice was under review and it appeared that it might be changed. However, subsequent to the publication of schedule 4 for public hearings, the Bureau of Customs reaffirmed its practice (TD 54726(26)). Although there would seem to be considerable doubt as to the conclusion that a coal-tar synthetic rubber is not embraced within the provisions of either paragraph 27 or 28, in view of the long-established practice, as recently reaffirmed, a number of informal meetings were held with interested parties with a view to obtaining a better un-

---

8. The Explanatory Notes also indicate that it was important that any revision of the definition not apply to merchandise such as that involved in United States v. Esso Standard Oil Co., 41 CCPA 171, C.A.D. 546 (1953). See e. g., *Study*, p. 410, 416, 417, 421, 429. The merchandise in issue in that case consisted of a copolymer of styrene and isobutylene which the court held to be a resin-like substance and not a synthetic rubber, stating (41 CCPA at 176):

We further agree with the statement in the decision below that all of the experts in the rubber industry appearing on behalf of the Government convincingly established that capability of vulcanization and elasticity are vitally essential to all rubbers. There can be no question but that the imported goods cannot be vulcanized and have not the property of elasticity such as are necessary characteristics of rubber, either natural or synthetic.

9. For example, Polymer's attorney, E. R. Pickrell, suggested, in a letter dated January 21, 1959, to the Chairman of the Tariff Commission that the rubber definition be revised to read (*Study*, p. 410):

The term "rubber," in this subpart, means a substance in bale, crumb, powder, latex, or other crude form, whether or not containing fillers, extenders, pigments, or rubber-processing chemicals, which can be vulcanized or similarly processed into materials which can be stretched at 68°F, to at least twice their original length and which, after having been so stretched and the stress removed, return within ten minutes to less than 1½ times their original length.

This definition, Pickrell stated, would "insure that materials which are generally recognized to be synthetic rubbers and which have been so classified by the customs authorities will continue to be so classified," and would "adequately and realistically separate rubbers from other materials * * *."

derstanding of the implications of this present practice.

The results of these informal meetings are reflected in headnotes 1 and 2. Headnote 1, together with a complementary change in the provisions of part 1 eliminating therefrom any reference to synthetic rubber, make it clear that subpart B covers all synthetic rubber whether or not obtained, derived, or manufactured in whole or in part from any coal-tar product described in part 1.

Headnote 2 concerns itself with the physical properties of rubbers. This definition is necessitated by virtue of the emergence of synthetic rubber as a commercial concept. Inasmuch as synthetic rubber is a man-made product, any definition attempting to equate it with its natural counterpart necessarily involves classification nuances which can be resolved only by arbitrary distinctions. The difficulty of arriving at a definition is demonstrated by the fact that the domestic industry has not yet been able to agree on all the factors involved in a precise definition.

In a preliminary draft of part 4B distributed to interested parties subsequent to the hearings, the definition of rubber *was the same as that now incorporated in headnote 2 except that the part of the definition treating with permanent set would have required that the product return within five minutes to less than 110 percent of its original length.* A comment received from the principal foreign shipper (see Appendix) indicated that 110 percent was too restrictive and would not include the very products that had been the subject of the long-continued customs practice. In the light of the representations made, in particular the assurances that the proposed change to 150 percent would not affect the status of another copolymer of styrene and butadiene which was the subject of CAD 546, the permanent set was changed to 150 percent. [Emphasis added.]

It appears from the best available information that the final definition of rubber would not change existing customs practices and, also, would include only those products which are properly known as synthetic rubbers.

\* \* \* \* \* \*

From what has been said, it is patent that the Commission's primary intent in revising the rubber definition was to modify the stretch and return tests. There is not even a suggestion that the Commission at any time considered limiting these tests to elastomers without fillers, extenders, pigments or rubber-processing chemicals. Accordingly, the mere rearrangement of the "whether or not containing fillers, \* \* \*" clause in nowise changed the meaning or effect of the definition with respect to the applicability of the requirements specified therein.

Furthermore, while defendant argues that the tests are limited to the so-called "crude" natural and synthetic rubbers, i. e., rubber polymers or elastomers not containing fillers, etc., it overlooks the uncontradicted testimony of its own witness Anthony (which has been previously quoted) that a large amount of *crude* synthetic rubber, known as SBR, that is manufactured by oil companies and sold in commerce as "master batches", contains oil—which is an extender—and carbon black—which is a "reenforcing filler".

Thus, although the record establishes that crude *natural* rubber does not normally contain fillers, extenders, pigments or rubber-processing chemicals, there is a very substantial quantity of "crude" synthetic rubber that contains one or more of these compounding ingredients.[10]

10. In this respect, we note that Vol. 11, McGraw-Hill Encyclopedia of Science and Technology (1966), p. 639, states, with reference to butadiene-styrene rubbers:

The butadiene-styrene rubber, formerly designated as GR-S types, but now called SBR, constitutes the bulk of the synthetic rubber production. All the

 Headnote 2 was intended to apply, as the Explanatory Notes make clear (*Study,* p. 100) to "coal-tar synthetic rubbers which are copolymers of styrene and butadiene"; this patently includes the "crude" SBR of commerce containing fillers. Under this headnote, there is no double standard for "rubber"; what applies to one elastomer containing fillers, extenders, etc. applies to all elastomers, whether they be "crude" or "compounded". It thus must be concluded that the rubber definition applies *in toto* to all substances which meet the standards prescribed therein—whether or not compounded with fillers, etc.[11]

 In short, whether the material comprising the midsoles of the imported shoes is "rubber" for purposes of the Tariff Schedules depends not upon what it is called in the trade, e. g., "rubber", "rubber compound" or "rubber product", but upon whether it meets the objective standards of headnote 2.[12]

This brings us to the heart of the matter. Can this midsole material—the

---

SBR-type rubbers are obtained by the emulsion polymerization of butadiene and styrene in varying ratios. However, in the most commonly used type the ratio of butadiene to styrene is approximately 78.22.

\* \* \* \* \*

The cold oil-extended type, prepared by the replacement of a portion of the polymer by a heavy fraction oil, accounts for more than 50% of the cold-rubber production. Its advantage is primarily economic. *Master batches containing both oil and carbon black* have the advantage of process simplification. [Emphasis added.]

Further, in the section on "Rubber products" the same publication states (*id.* at p. 645):

The base rubber, a cold SBR, is currently the most widely used rubber for passenger-car tires. Some manufacturers prefer an *oil-extended SBR* as the base polymer. This differs from the cold SBR in being made to a considerably higher viscosity and *is extended at the latex stage by the addition of 25 or more parts of a petroleum oil to each 100 parts of polymer.* When the oil is used to facilitate processing, the proportion of carbon black is calculated on the combined oil and rubber present. Thus, if in the above recipe a 37.5-part oil-extended rubber were used, the proportion of carbon black on the combined oil and rubber, that is, 137.5 parts, would be 68.75 parts. [Emphasis added.]

11. Defendant's and amicus' interpretation, it may be noted, could also lead to perhaps unintended results. For example, if the physical tests were limited solely to the elastomer in a compounded substance, as they contend, a compound or mixture containing less than ½ of 1 percent by weight of elastomers would be rubber and, if the compound or mixture comprised over 50 percent by weight of the footwear, might render the article classifiable under TSUS item 700.60 and therefore subject to duty upon the basis of the American selling price, as defined in section 402 or 402a of the Tariff Act of 1930, as amended, of like or similar articles manufactured in the United States. Such a result could conceivably be required by schedule 7, part 1, subpart A, headnote 3(b), which provided at the time of entry that "[s]ubject to the provisions of section 336(f) of this Act, the merchandise in item 700.60, if the rubber portion thereof is wholly, or over 50 percent by weight, of natural rubber, and in item 700.60 shall be subject to duty upon the basis of the American selling price, as defined in section 402 or 402a of this Act, of like or similar articles manufactured or produced in the United States." Whether the tariff protection afforded to domestic producers of rubber footwear by utilization of the American selling price method of valuation was intended to cover footwear of this type is not, of course, before us for consideration.

12. We cannot agree with plaintiff's contention that the midsole in question consists, in effect, of two substances: iron powder and rubber. For plaintiff has failed to establish that iron powder, in the quantity used in the midsoles, cannot be a filler or extender in a rubber compound, or that there is insufficient rubber polymer, by volume, to form the matrix for the iron powder. In fact, the evidence points to the contrary, namely, that the midsole, which contains at least 10 percent by weight of crude and synthetic rubbers, is a "rubber compound".

"substance" in crude form containing fillers—be cross-linked and, after cross-linking, be stretched at 68° F. to at least three times its original length and then, after having been stretched to twice its original length and the stress removed return within 5 minutes to less than 150 percent of its original length?

The midsole material can, of course, be cross-linked inasmuch as it is vulcanized. However, there is not a scintilla of evidence in the record that the midsole mixture or compound *in crude form* was incapable, after cross-linking, of meeting the specified stretch and return requirements. For the laboratory stretch test, by which the parties agreed to abide, was performed upon the *finished midsoles*. Reliance upon this test is totally insufficient inasmuch as the undisputed testimony establishes that the method of curing or vulcanizing can affect the elasticity of the compound. (R. 71) The record is silent regarding the process used here; indeed, we are left completely unaware as to what extent or how the particular curing process used here may have affected the compound's elastic capability. In the absence of stipulation or evidence linking the tests performed upon the finished product to the performance capability of the compound material in crude form, the stretchability of the *finished* midsole is irrelevant. For the finished midsole is not a substance in crude form to which the stretch and return tests of headnote 2 are applicable.

■ The basis of the classification here, which carries with it a presumption of correctness, is the classifying officer's finding that the midsole consists solely of "rubber" as defined in headnote 2. Plaintiff has failed to establish that the midsole is not "rubber" as that term is so defined.

In sum, plaintiff has failed to discharge its burden of proof; hence, its protest must be overruled and the classification affirmed. Judgment will be entered accordingly.