**HUB FLORAL CORPORATION**

v.

**UNITED STATES.**

**C.D. 4669; Court No. 71–9–01092.**

United States Customs Court.

Aug. 31, 1976.

Doherty & Melahn, Boston, Mass. (William E. Melahn and Walter E. Doherty, Jr., Boston, Mass., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Frank J. Desiderio and Edmund F. Schmidt, New York City, trial attys.), for defendant.

WATSON, Judge.

This case involves the classification of articles known as chenille stems, 12-inch lengths of flexible wire twisted around textile material in a manner which allows the textile fibers to protrude prominently, giving the article a fuzzy caterpillar-like appearance. The chenille stems were classified as parts of artificial flowers,[1] a classification which in the terms of the tariff schedules general interpretive rules presupposes that the use of these articles as parts of artificial flowers exceeds all other uses combined.[2]

Plaintiff argues for classification of the chenille stems as other wire covered with textile material[3] or alternatively as strands of wire covered with textile material.[4]

---

1. Item 748.21 of the Tariff Schedules of the United States:

> Artificial flowers, trees, foliage, fruits, vegetables, grasses, or grains, parts of the foregoing, and articles made of the foregoing (except articles provided for in item 748.15 or 748.40 of this subpart):
>
> ✻  ✻  ✻  ✻  ✻  ✻
>
> 748.21    Other . . . . . . . . . . . . . 42.5% ad val.

2. *General Headnotes and Rules of Interpretation*

> ✻  ✻  ✻  ✻  ✻  ✻
>
> 10. *General Interpretative Rules.* For the purposes of these schedules—
>
> ✻  ✻  ✻  ✻  ✻  ✻
>
> (e) in the absence of special language or context which otherwise requires—
> (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind

to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

> ✻  ✻  ✻  ✻  ✻  ✻
>
> (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

3. Item 642.97 of the TSUS, as modified by T.D. 68–9:

> Milliners' wire and other wire covered with textile or other material not wholly of metal:
>
> ✻  ✻  ✻  ✻  ✻  ✻
>
> 642.97    Other . . . . . . . . . . . . . [1969] 12% ad val.
> [1970] 11% ad val.

4. Item 642.18 of the TSUS, as modified by T.D. 68–9:

> Strands, ropes, cables, and cordage, all the foregoing, of wire, whether or not cut to length, and whether or not

Plaintiff disproved the correctness of the assigned classification by showing it resulted from the erroneous reasoning that the use of such articles as stems for live flowers was a use as parts of artificial flowers. This error in the classification was revealed in the testimony of the customs import specialist who made the advisory classification and apparently arose from his reliance on a customs classification circular (C.I.E. 1705/64). That document (exhibit 2) was circulated to customs officials to promote uniform classification of chenille stems as parts of artificial flowers and it spoke of these articles as follows:

> The chenille stems are of metal wire covered with textile materials and are for insertion into the heads of natural flowers to serve as flower stems. . . .

■ The reasoning embodied in this circular and applied to the classification of the importations at bar is faulty. The tariff provision for artificial flowers envisions flowers which are entirely artificial. A natural flower with an artificial stem is not an artificial flower. It follows that the artificial stem of a natural flower is not part of an artificial flower.

After this demonstration of the erroneous nature of the classification, the case in effect became a fresh dispute with the government advocating classification as parts of artificial flowers based on chief use by hobbyists in the fashioning of artificial flowers and the plaintiff seeking to prove a greater use by florists in stemming natural flowers and making floral arrangements.

■ On this issue I found plaintiff's proof the more persuasive of the two, leading me to conclude that the uses of these articles by florists in connection with natural flowers exceeds that of hobbyists in making artificial flowers. Aside from the conflict of testimony from which I felt defendant's witnesses came away second best, defendant's case was weakened by the aforementioned evidence of its previous reliance on the use of these articles in stemming natural flowers. I was not persuaded by defendant's argument that the stemming use had declined with the introduction of newer products in the field.

Furthermore, I found the proof as to the uses of individual hobbyists to be less than satisfactory. The multitude of forms and articles which can be made from these importations by the individual hobbyists made the proposition that only flowers are made in significant numbers seem tenuous to me. I found the proof of use by florists more direct, more credible and more plausible.

■ Following plaintiff's successful proof that the use of these articles by florists in connection with live flowers exceeds the use by hobbyists in fashioning artificial flowers (which is a negation of possible chief use as parts of artificial flowers) the dispute focuses on plaintiff's primary claim that these articles are properly classifiable as other wire covered with textile material under item 642.97 and its alternative claim that they are classifiable as strands of wire covered with textile material under item 642.18.

Defendant argues that the wire referred to in item 642.97 must be a single metal filament because the definition of wire in headnote 3(i) of schedule 6, part 2, subpart B speaks of wire in the singular as "[a] finished, drawn, non-tubular product, of any cross-sectional configuration, in coils or cut to length, and not over 0.703 inch in maximum cross-sectional dimension."

fitted with hooks, swivels,
clamps, clips, thimbles, sockets, or other fittings or
made up into slings, cargo
nets, or similar articles:
  Not fitted with fittings
   and not made up into
   articles:

       *     *     *     *     *     *

642.18   Covered with textile
       or other nonmetallic
       material ........ [1969] 12% ad val.
                       [1970] 10% ad val.

If indeed this headnote means that wires named in part 2 of schedule 6 can only be classified therein if they consist of a single metal filament I would not consider this limitation to extend to the wire articles set out in part 3 of schedule 6, the part with which we are here concerned. In part 2, subpart B, wire is being considered in its quintessential form as one of the basic shapes of iron or steel (schedule 6, part 2, subpart B, headnote 1). In such a context a limitation to articles of irreducible single filament form might be plausible. However, part 3 deals with wire in more differentiated forms in which a limitation to single filament articles would be artificial. I fail to see for example how the barbed wire of item 642.02 would not be considered barbed wire if it were composed of a double strand of wire set with barbs or how the galvanized wire fencing of item 642.35 would exclude fencing composed of doubled wires.

Moreover, the headnote to part 3 which deals with wire refers back to the part 2 headnote only for the maximum cross-sectional measurement and does not reiterate the remaining language with its potential single filament implications. It states that " 'wire' is deemed to be a base-metal product which conforms to the respective cross-sectional measurements for base-metal wires in part 2, *whether or not conforming otherwise to the specifications set forth therein.*" (Emphasis supplied.) It seems to me the headnote to part 3 was written with an awareness that it was directed to articles composed of wire and still displaying the characteristics of wire but without any intention that the wires referred to in part 3 be single filament articles only.

Consequently, when the tariff provision to which item 642.97 refers lists milliners' wire and other wire covered with textile material, I see no reason either in the headnote or in the fact that wire in its basic form may be defined in the singular to hold that these articles may not be composed of more than one filament of wire. In short I

would not read a limitation to single filament articles into part 3 because the only headnote from which such a limitation could be derived does not apply to part 3 except to provide a cross-sectional measurement and the more reasonable way to read the wire articles named in part 3, including item 642.97, is to require that they be composed of wire with the requisite cross-sectional dimension and not necessarily that they be a single filament of that wire.

In somewhat the same vein as defendant's argument that the wire described in item 642.97 must be of a single filament is its contention that the textile covering must be a complete covering.

I don't think it is correct to posit a single unvarying meaning for the word "covered." In the abstract sense it certainly will admit of meanings which allow a less than all-enclosing covering. In the provision under consideration, I can understand it to describe wire which has a textile covering which for some reason still allows glimpses of the underlying wire.

Defendant relies heavily on the existence in prior tariff acts of a single provision governing covered wire (paragraph 316(a) of the Tariff Act of 1930; paragraph 316 of the Tariff Act of 1922). I don't think those provisions or their interpretations ever foreclosed the possibility of a less than "perfect" covering. In fact, when the word "covered" was implicitly treated as meaning completely covered, it was only with respect to electrical wire where such a view has an obvious logical and functional basis.[5] However, the provision under consideration resulted from a deliberate and clearly expressed intention to distinguish in the tariff schedules between "electrical" and nonelectrical wire. (*Tariff Classification Study,* 1960, Schedule 6, p. 183.)

It follows in my view that the interpretation of covering which should be made in this new provision should relate to the nature of the articles provided for and not be an unquestioning automatic carryover from prior consideration of electrical wire. It is

---

5. *United States v. C. J. Tower & Sons,* 17 CCPA 201, T.D. 43647 (1929); *Mitsui & Co.*

*(U.S.C.), Inc. v. United States,* 65 Cust.Ct. 268, 271–72, C.D. 4087 (1970).

my opinion the wire provided for in this item is of a type regarding which a requirement of a perfect covering would be unrealistic and excessive.

Milliners' wire is a fiber-wrapped wire which is sewn into hats to provide shaping. The existence of wires of a similar nature was recognized in the 1948 *Summaries of Tariff Information* (Vol. 3, part 2, p. 127) when mention was made of covered steel wire—" . . . for fastening decorations, as for florists, and other nonelectrical uses." Still further back is found mention in the *Summary of Tariff Information* of 1921 (p. 407) of wire covered with cotton, silk, paper or other materials, used extensively in the manufacture of millinery, novelties, tags, artificial flowers, clothing and electrical manufactures. I therefore find good reason to associate the imported wire (which has here been proved to be used predominantly by florists in stemming flowers and fashioning floral arrangements) with the covered wires which have been historically noted and recently provided for in the separate provision of item 642.97. I further find that these are not articles in which there is a reasonable ground for demanding absolute perfection or conventional completeness of covering. There is no indication that their covering need be more than substantial to have them serve the purpose for which they are used.

My examination of these articles persuades me that they are covered within the meaning of that term. Admittedly the textile material which forms the cover is initially entrapped between two strands of wire so that the filaments which form the cover emanate from the core of the article. But the practical, tactile and visual result is a covered wire. The purpose of uniting the wire and the textile material is to obtain a product with the flexible strength of wire and the external characteristics of the fiber. These external characteristics are an aid to the comfortable handling and manipulation of the wire, an important improvement of its gripping power and a cushioning of what would otherwise be the damaging impress of the wire on the material around which it

may be twisted. The fibers also have an obvious visual effect, adding color and bulk to the wire and concealing it to a great extent from all but the closet scrutiny. These are all functions of a covering and to hold that this article is not covered merely because the covering is achieved in an unconventional manner and to a less than total extent would be unreasonably restrictive.

In sum, I conclude that these chenille stems are wire covered with textile material and are not to be excluded from the provision which is most appropriate for their classification both by plain meaning and history merely because they are composed of two strands of wire and are covered in an unconventional manner.

In light of my conclusions regarding the appropriateness of item 642.97, particularly as viewed in its historical context, I do not dwell on plaintiff's alternative claim under item 642.18. Although that provision might have some literal appeal in that it speaks of "strands" of wire, I read it as governing articles made to sustain weight or tension or transmit force in some manner. *See Flexible Plumber Tools, Inc. v. United States,* 66 Cust.Ct. 330, C.D. 4210 (1971).

Judgment will be entered accordingly.

