INTERNATIONAL SEAWAY
TRADING CORP.

v.

UNITED STATES.

C.D. 4773; Court No. 68/2743–54687.

United States Customs Court.

Oct. 30, 1978.

Sharretts, Paley, Carter & Blauvelt, New York City (Patrick D. Gill, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Herbert P. Larsen, New York City, for defendant.

Lamb & Lerch, New York City (Richard J. Kaplan, New York City, of counsel), for amicus curiae.

MALETZ, Judge:

This case is a sequel to *International Seaway Trading Corp. v. United States*, 488 F.2d 544, 61 CCPA 20, C.A.D. 1112 (1973), *rev'g* 69 Cust.Ct. 58, C.D. 4375, 349 F.Supp. 1019 (1972). The record in that case has been incorporated into the record here.

The imported merchandise in the present case consists of footwear invoiced as basketball high shoes which was imported from Hong Kong and is the same in all material respects as the footwear in the incorporated case. And as in the incorporated case, the imported footwear was classified by the Government under item 700.60 of the Tariff Schedules of the United States (TSUS) as "[f]ootwear * * * which is over 50 percent by weight of rubber or plastics * * *," and assessed with duty at the rate of 20 percent ad valorem. Plaintiff claims here— as it did successfully in the incorporated case—that the merchandise should be classified under item 700.70, TSUS, as "[f]ootwear * * * [w]ith soles of material other than leather: [w]ith uppers of vegetable fibers," with duty assessable at the rate of 15 percent ad valorem.[1]

The pertinent provisions of TSUS read as follows:

Classified under:

Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

* * * * * * * *

Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):

* * * * * * * *

700.60 Other ...................... 20% ad val.

Claimed under:

Footwear, with uppers of fibers:

* * * * * * * *

With soles of material other than leather: ·

700.70 With uppers of vegetable fibers .. 15% ad val. ·

*Schedule 4, Part 4, Subpart B* :

*Subpart B headnotes* :

1. This subpart covers all rubber whether or not obtained, derived, or manufactured in whole or in part from any product described in part 1 of this schedule.

2. For the purposes of the tariff schedules, the term "rubber" means a substance, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross linked, and which after cross linking can be stretched at 68°F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150 percent of its original length, and includes such substance whether or not containing fillers, extenders, pigments, or rubber-processing chemicals.

I. *The Decision of the Court of Customs and Patent Appeals in the Incorporated Case*

In reaching its decision in the incorporated case upholding the plaintiff's claim, the Court of Customs and Patent Appeals, in a 4–1 decision, first stated (488 F.2d at 545, 61 CCPA at 22):

The nature of the "Basketball High Shoes," apparently made with heavy midsoles for training purposes, may be seen from certain stipulated facts and from Defendant's Collective Exhibit "A", which is a copy of U.S. Customs Laboratory Report No. S12355, referred to in the following stipulation.

The stipulation reads:

1. The uppers are of vegetable fibers.

2. The footwear is in no part of leather.

1. The Customs Service has limited the decision of the Court of Customs and Patent Appeals in the incorporated case to the merchandise covered by the entries there in issue. See T.D. 74–99, as modified by T.D. 74–196.

3. The midsoles of the instant footwear contain, as components, among other things, "Natural Rubber RSS" and "Synthetic Rubber". That "Natural Rubber RSS" and "Synthetic Rubber" are substances, whether natural or synthetic, in bale, crumb, powder, latex, or other crude form, which can be vulcanized or otherwise cross-linked, and which after cross-linking, can be stretched at 68°F. to at least three times its original length and which, after having been stretched to twice its original length and the stress removed, returns within 5 minutes to less than 150% of its original length.

4. Both parties agree to be bound by a determination by the Customs Laboratory as to whether the vulcanized so-called iron powder midsole material can be stretched to three times its original length.[2]

5. Defendant's Collective Exhibit "A" is correct in its determination of the relative weights of the respective materials insofar as they were therein determined.

Defendant's Collective Exhibit "A" (Customs Laboratory Report No. S12355) includes the following statements:

The midsoles in their present condition (containing the iron powder) are not capable of being stretched to three times their original length. In our opinion the rubber hydrocarbon of the midsole would conform to the physical requirements of the term "rubber" as defined in Headnote 2, Subpart B, Part 4, Schedule 4 of TSUSA 1969.

The weight of each sneaker minus the lacing was found to be 272 grams (left sneaker) and 283.5 grams (right sneaker). The midsoles were found to weigh 156.5 grams (left sneaker) and 169.2 grams (right sneaker). Three tests on the midsole of the left sneaker showed an average of 89% by weight of iron and iron oxide. This is equivalent to 51.2% by weight of the left sneaker minus the lacing. Assuming 89% by weight of iron and iron oxide in the right midsole, the right sneaker minus the lacing contains 53.1% iron and iron oxide.

\* \* \* \* \* \*

Three tests on the midsole of the right sneaker showed an average of 89.5% by weight of iron and iron oxide. This is equivalent to 53.4% by weight of the right sneaker minus the lacing.

In the incorporated case, the Government and the amicus curiae took the position that to be "rubber" within the meaning of Headnote 2, it is only necessary that a substance contain a natural or synthetic rubber which in crude form, *before adding* any fillers, extenders, pigments or rubber-processing chemicals, is capable of being cross-linked or vulcanized and thereafter be capable of meeting the specified stretch and return tests prescribed by that Headnote. As to the midsole in the imported basketball shoe there involved, the Government and the amicus curiae contended that the entire midsole is "rubber" under the Headnote 2 definition because the specified stretch and return tests should apply only to the precursor natural and synthetic rubber materials (without filler) used in the manufacture thereof and the stretch and return tests do not apply to the finished midsole. 488 F.2d 544, 61 CCPA at 23.

The Court of Customs and Patent Appeals rejected this interpretation and agreed with the Customs Court that the correct interpretation of Headnote 2 is that "rubber" means a substance in crude form, whether or not containing fillers, extenders,

---

2. In the present case, by agreement of the parties, plaintiff's motion to incorporate was granted with the qualification that paragraph 4 of the stipulation in the incorporated case is to read as follows:

Both parties agreed that the determination by the Customs Laboratory as to whether the vulcanized so-called iron powder cross-linked sole material can be stretched to three times its original length was correctly arrived at and represents the proper results of the test as performed.

Thus in the present case the defendant does not agree to be bound by the Customs Laboratory's determination in the incorporated case.

pigments, or rubber-processing chemicals, which is capable of being cross-linked or vulcanized and thereafter be capable of meeting the specified tests. *Id.* 488 F.2d at 547, 61 CCPA at 24. The appellate court added in this connection (*ibid*):

> The interpretations of Headnote 2 urged by the Government and by the amicus curiae require that only the "Natural Rubber RSS" and the "Synthetic Rubber" components (*excluding* the filler) of the midsole mixture be capable of being cross-linked and thereafter passing the stretch and return tests; whereas the filler is *included* for purposes of the weight determination under item 700.60, TSUS. In other words, they urge that the iron powder filler be excluded when making the qualitative chemical identification under Headnote 2, but that the iron powder filler be included when making the quantitative weight determination under item 700.60, TSUS. We think these interpretations are inconsistent. Such inconsistency should not be imputed to the Congress in the absence of clear evidence of intent—evidence which does not appear in the record or briefs. [Emphasis in original.]

The Customs Court, however, found that plaintiff had not demonstrated that the midsole material in crude form (with an actual composition of about 10 percent by weight of rubber and about 90 percent by weight of iron powder) could not have been vulcanized or cross-linked in such a manner as to pass the stretch and return tests even though the actual samples submitted to the Customs Laboratory could not pass those tests. Thus, the Customs Court imposed on the plaintiff the burden of proving that the midsole material could *not* have been cross-linked by another process to yield a cross-linked mixture which would, in fact, pass the stretch and return tests. 488 F.2d 544, 61 CCPA at 23. On this aspect, the Court of Customs and Patent Appeals reversed and stated (488 F.2d at 546–547, 61 CCPA at 23–4):

> Our disposition of this appeal will focus on the midsole portion of the imported shoes since the midsole constitutes over 50 percent by weight of the total weight of each shoe. Both parties agreed to be bound by a determination of the Customs Laboratory as to whether the imported midsoles are capable of being stretched to three times their original length. The Customs Laboratory determined that the imported midsoles are *not* capable of being stretched to three times their original length.

> We hold that appellant met its burden of proof regarding the impropriety of the Government's classification by evidence in the form of the Customs Laboratory report. We find that there is no evidence in the record showing that the Government, thereupon, met its burden of going forward to prove that the cross-linking could have been performed by *some other method* so that the midsole mixture would meet the stretch and return tests. It may be that in this case, involving as it does a mixture containing nearly 90 percent by weight of iron powder, the Government would be hard-pressed to make such an affirmative showing. [Emphasis in original.]

II. *Whether the Defendant Has Met Its Burden of Proving That the Cross-Linking Could Have Been Performed by Some Other Method So That the Midsole Mixture of the Imported Footwear Would Meet the Stretch and Return Tests Required by Headnote 2*

A. *Testimony of Dr. Eckert*

Against this background, defendant in the present case called as a witness Dr. Charles F. Eckert, a chemist and research associate at Uniroyal, Inc., whose testimony, defendant insists, proves that the midsoles of the imported footwear could have been cross-linked by some other method so as to meet the statutory stretch and return tests for rubber, as specified in Headnote 2. We now consider that testimony. Dr. Eckert testified that as a chemist and research associate at Uniroyal he supervises the compounding and evaluation of various kinds of rubber compounds, most of which are used

in tires. He has a Ph.D. in chemistry and his areas of research are in high polymers, mostly with rubber. The witness testified that, using the generally recognized standards of the America Society of Testing Materials (ASTM), he attempted to duplicate the recipe for the midsole material of the imported footwear as set out in defendant's exhibit J.[3] The witness stated, however, that he was not certain of the accelerator used, but used what he thought was intended.

Dr. Eckert stated that stretch and return tests were performed on the recipe purporting to duplicate that in defendant's exhibit J as well as on other recipes of greater cross-linking on greater iron content. The test results were obtained in most instances at 72° room temperature rather than at 68° as specified in TSUS. However, the difference between tests performed at 72° and tests performed at 68° were immeasurable according to the witness. With respect to the tests performed on the recipe purporting to duplicate the recipe in defendant's exhibit J, Dr. Eckert testified that the tests for elongation resulted in a 240% increase in length before breaking (which means that the material was stretched to 3.4 times its original length before breaking) and that the stretch and return tests resulted in the material returning to 104%, 110% and 113% of its original length.

Dr. Eckert stated that other recipes tested contained higher percentages of iron powder and demonstrated that elongation decreased as the percentage of iron powder increased. Additionally, he observed that when informal stretch tests were conducted on a recipe of higher sulfur content, lesser elongation resulted. He further observed that elongation will also decrease with the age of the rubber, as well as with the pro-oxident effect of iron powder acting to decrease elongation.

On cross-examination, Dr. Eckert stated that he used 40-mesh iron powder in his recipe although the manufacturer's recipe did not specify the size of the iron powder. He testified that he did not know what effect a different size mesh powder would have but that the results would be different. Dr. Eckert then performed in open court a hand stretch test on a sample of material from the recipe purporting to duplicate the midsoles in issue. Breakage occurred at a point where it was unascertainable if it stretched to three times its original length. A second test in open court was conducted on a duplicate sample which was stretched to more than three times its original length and returned to less than 150% of its original length within 5 minutes.

On further cross-examination, Dr. Eckert testified that he was unfamiliar with the commercial production of rubber for footwear as he was not involved in commercial production at all. His activities were strictly limited to research and development. He testified that the mixes he used in the recipe were made in a ratio of $\frac{1}{20}$th of the amounts actually shown on the original recipe, defendant's exhibit J, *supra*. He acknowledged that he made only one batch of

3. This recipe was stated by the manufacturer of the imported footwear to be as follows (defendant's exhibit J):

| Material | Quantity | | | Weight % |
|---|---|---|---|---|
| Natural Rubber RSS | 2,200 | gm. – 4.8500 | lbs. | 7.47% |
| Synthetic Rubber | 540 | " – 1.1905 | " | 1.83% |
| Stearic Acid | 20 | " – 0.0441 | " | 0.07% |
| Zinc Oxyde [sic] | 100 | " – 0.2205 | " | 0.34% |
| Sulphus [sic] | 40 | " – 0.0882 | " | 0.14% |
| Anti-oxydent [sic] (Anti C) | 20 | " – 0.0441 | " | 0.07% |
| Acceralator [sic] DM | 16 | " – 0.0353 | " | 0.06% |
| Acceralator [sic] D | 7 | " – 0.0154 | " | 0.02% |
| Iron Powder | 26,500 | " – 58.4219 | " | 90.00% |
| | 29,443 | gm. – 64.9100 | lbs. | 100.00% |

materials for the test and that he would not rely upon the test results of one batch in the development of a product which he was testing for his own company. He further acknowledged that there was a possibility of error which could be as much as 100% in converting the recipe to his sample.

In converting the material at a ratio of 1 to 20, Dr. Eckert conceded that only the weight of the iron, rubber and zinc was double checked. None of the other components, including the sulfur, was double checked. The witness admitted that sulfur has an effect upon vulcanization, that it is the primary curing agent, and that it will have an effect on the ability of a mix to meet the stretch and return tests.

Dr. Eckert testified further on cross-examination that the rubber used in his tests was a high grade of "clean rubber" which is used for laboratory experimentation and that he doubted that this type of rubber was the type used in manufacturing footwear. He added that use of a high grade clean rubber as opposed to a less pure rubber of lower density would have an effect on the ability of the sample to meet the stretch and return tests. And he conceded that the slightest variation in the materials used could have a bearing on the ability of the sample to meet the stretch and return tests.

### B. Testimony of Dr. Eirich

To rebut the testimony of Dr. Eckert, plaintiff called as a witness Dr. Frederick R. Eirich, distinguished professor of polymer chemistry at the Polytechnic Institute of New York. Dr. Eirich's field of specialization is polymer chemistry and has been since his dissertation in 1932. Dr. Eirich is currently engaged in the preparation of an advanced textbook on rubber technology which was commissioned by the Educational Committee of the Division of Rubber Chemistry of the American Society of Chemists. Prior to Dr. Eirich's position at the Polytechnic Institute of New York, he held teaching positions at the University of Cambridge, England, and at the University of Vienna. Dr. Eirich has also acted as a consultant to a number of industries related to rubber and its manufacture, as well as plastics and its manufacture; and had conducted training seminars in industry, including a seminar at Uniroyal. Dr. Eirich was chairman of the Gordon Conference of the American Association for the Advancement of Science—a research conference on polymers composed of a selected group of 100 scientists and leaders of industry. From 1972 to 1974 the witness was president of the American Society of Rheology.[4]

Dr. Eirich testified that he had performed the stretch and return tests as set forth in Headnote 2 on a portion of an illustrative exhibit of the imported merchandise and that the material had failed to meet the tests. He further testified that he had witnessed the demonstration test conducted in open court by Dr. Eckert and that the test itself as well as the results of other tests conducted by Dr. Eckert outside of the court clearly showed that where the composition reached a 90% iron filler point (as in the case of the imported footwear) the elongation drops off considerably and often will not meet the test. Thus he stated that at the 90% iron filler point a precipitous fall in the mechanical properties (elongation) occurs so that even ½% iron filler below or above this 90% point throws the elongation results below or above the permissible limits for the stretch and return tests prescribed by Headnote 2. He added that other very minor variations in the samples tested at this critical juncture point such as the type of accelerator, or minor variances in composition, could similarly throw the test results one way or the other.

Dr. Eirich testified that based on accepted scientific standards in the polymer industry, in order for the tests performed by Dr. Eckert to have statistical validity there should have been between ten to twenty samples taken from at least three or four batches. Consequently, according to the witness, the rapid variations in properties

---

4. Rheology is concerned with the flow, deformation and mechanical response of all materials, particularly polymeric materials and rubbers.

demonstrate that very minor changes in composition, the existence of indigenous flaws, and the existence of and size of voids as a result of the size of the iron powder filling, will all cause variations in the ability of the material to pass the stretch and return test. Dr. Eirich concluded that given the recipe set out in defendant's exhibit J under manufacturing conditions, you will have a set of conditions which will lead to general failure in terms of the stretch and return test.

Dr. Eirich testified that as to Dr. Eckert's laboratory tests, the results could not be statistically significant because there were not enough tests or enough batches to produce a spread of statistical significance. He stated that he would consider ten tests on each of three separate batches to be an adequate number of tests.

## C. *Conclusion*

Based on the foregoing, it must be concluded that defendant has not met its burden of proving that the cross-linking could have been performed by some other method so that the midsole mixture of the imported footwear would meet the stretch and return tests required by Headnote 2. For defendant has not established that the *same ingredients* as were used to manufacture the midsoles in issue could have been cross-linked by some other method so as to meet the stretch and return tests. Defendant's evidence in terms of the burden imposed by the Court of Customs and Patent Appeals came in the form of testimony and exhibits prepared by defendant's witness Dr. Eckert. At the outset, it is to be noted that Dr. Eckert, purportedly using the ingredients contained in the midsoles, was able to produce a sample which met the stretch and return tests set out in Headnote 2. However, in preparing the mix for his tests, the witness used high grade pure rubber which he doubted is the type of rubber used in manufacturing footwear. Certainly, if these tests are to be given probative weight, commercial footwear rubber should have been used. Considering the witness' own admission that the slightest variation in materials used could have a bearing on the ability of the mix to meet the stretch and return tests, this obvious deficiency in the tests performed cannot be overlooked.

There are other factors which also make questionable the validity of the results reached by Dr. Eckert. As was pointed out by plaintiff's witness Dr. Eirich, an insufficient number of test batches were made and an insufficient number of samples were tested in accordance with standards which would be applied scientifically in testing polymeric materials. In order for these tests to have had statistical validity there should have been at least ten to twenty samples taken from at least three or four batches.

Additionally, the recipe used by Dr. Eckert was made by reducing the manufacturer's weights and measures by a ratio of $\frac{1}{20}$th of the amounts actually shown on the manufacturer's recipe. Although Dr. Eckert made clear that the margin of error in measuring materials and putting them into a mix was as high as 100%, he admitted that only the iron, rubber, and zinc were double weighed. The other ingredients, including the antioxidants and the accelerators were not double weighed in spite of the fact that the amount of each of these ingredients could affect the ability of the sample to meet the stretch and return tests. It is particularly significant that there was no double check on the amount of sulfur used in the tests although it is clear from the testimony of Dr. Eckert that a variance in the amount of sulfur could materially affect the ability of the samples to meet the stretch test. The mesh size of the iron powder also could have affected the result of the tests. In this connection, Dr. Eckert used a 40-mesh iron powder because he did not know what size iron powder was used in the manufacturer's recipe. Further, notwithstanding the fact that the type of accelerator could have affected the test results, Dr. Eckert was not certain of the accelerator used.

In short, the test results reached by Dr. Eckert fall far short of meeting defendant's burden when it is considered (1) that Dr.

Eckert's tests were run under highly controlled laboratory conditions by a witness unfamiliar with the commercial production of rubber for footwear; (2) that the rubber used in the tests was different from that used in the commercial production of footwear; (3) that other components were used which may have differed from the constituent components used to manufacture the midsoles in issue; and (4) that the tests themselves were insufficient in quantum and quality in terms of accepted scientific standards in the industry.

### III.  *The Headnote 2 Test for Rubber*

■ As previously noted, in the incorporated case defendant and the amicus curiae took the position that a substance should be treated as rubber if it contained natural or synthetic rubber which met the statutory stretch and return tests *before* any fillers, extenders, etc. were added to the substance. Both this court and the Court of Customs and Patent Appeals disagreed holding that the tests must be applied to the substance with the filler included. If the substance, including the filler, does not meet those tests, it does not meet the definition of rubber.

Also, as previously noted, the Customs Service limited the decision of the Court of Customs and Patent Appeals in the incorporated case to the merchandise there in issue. T.D. 74–99, as modified by T.D. 74–196. In expressing its reason for limiting the decision, the Customs Service stated that it had uniformly interpreted the stretch and return tests prescribed by Headnote 2 to apply only to the crude rubber without the filler, and that it "believes that additional technical trade evidence and evidence of legislative intent is available to support this interpretation, and that additional arguments may be raised in support of the assigned classification." T.D. 74–196 at p. 355. In the present case, additional trade evidence was introduced, but that evidence was merely cumulative of that in the incorporated case. In the incorporated case, defendant called one witness from Uniroyal, Inc. and one from Converse Rubber Co. The essence of their testimony was that a substance is rubber if the elastomer is rubber, irrespective of the effects that any fillers may have on the elastomer. In the present case, defendant again called witnesses from Uniroyal, Inc. and Converse Rubber Co., along with a witness from American Synthetic Rubber Co. The testimony of these additional witnesses adds nothing to the testimony of the witnesses in the incorporated case. The opinion of these witnesses in both this and the incorporated case is simply in conflict with the governing statutes, Headnote 2, defining rubber as interpreted by the Court of Customs and Patent Appeals. On this question of law, their opinion simply must yield to that of the Court.

The limiting decision by the Customs Service also states the belief that there is evidence of legislative intent available to support defendant's interpretation of Headnote 2. As to this, defendant has presented a detailed legislative history of item 700.60 which demonstrates that it was the intent of Congress to protect the rubber sole footwear industry by valuing such footwear on the basis of American selling price in order to equalize the costs of production of such footwear in the United States and competing countries.[5] In this regard, it is to be observed that the Customs Service did not apply the American selling price valuation to the imported footwear here in issue (see defendant's brief, p. 2, n. 3). But even aside from this, while it appears from the legislative history of item 700.60 that Congress did indeed intend to close certain loopholes pertaining to the provisions for shoes which are over 50 percent by weight of rubber or plastics, this legislative history is

---

5. Headnote 3(b) to Schedule 7, Part 1, Subpart A, TSUS, as amended by section 57(a) of the Tariff Schedules Technical Amendments Act of 1965, 79 Stat. 945, reads as follows:

(b) Subject to the provisions of section 336(f) of this Act, the merchandise in item 700.60 shall be subject to duty upon the basis of the American selling price, as defined in section 402 or 402a of this Act, of like or similar articles manufactured or produced in the United States.

not controlling on the meaning of the Headnote 2 definition of rubber which covers *all* rubber products in TSUS. As Judge Rich stated in his concurring opinion in the incorporated case (488 F.2d at 548, 61 CCPA at 25):

> * * * [T]he Tariff Schedules have provided in Headnote 2 a statutory definition of "rubber" *which is not only controlling here* but obviously intended to apply to *every* item in the TSUS referring to "rubber" * * *. [Emphasis added.]

Further, the intent of Congress with regard to the stretch and return tests prescribed by Headnote 2 *must* have been directed to the rubber compound as imported with the filler because that is the only possible way the test could be performed. Again to quote from what Judge Rich stated (488 F.2d at 549, 61 CCPA at 27):

> As I read Headnote 2, I have to reject the argument that in testing the midsole material for compliance therewith one should ignore the principal component of that material—the iron powder, which is a "filler." Under the headnote the term "rubber" includes a cross-linked material (10%) and filler of iron powder (90%). It is not technically possible, I believe, to add "filler" to a cross-linked or vulcanized elastomer; the filler has to be compounded with the crude substance, after which they are vulcanized together. I do not see how the Customs Court can object to the fact that the laboratory stretch tests were performed on the *"finished midsoles."* If one wishes to know whether they are made of "rubber," they cannot be performed in any other way. The stretch tests, as specified in Headnote 2, apply only to cross-linked material—and "whether or not containing fillers." [Emphasis in original.]

The ASTM definition of "rubber products" is to similar effect in making clear that once filler material is added to a rubber or synthetic rubber, there is no way that the rubber can be removed from the compound to be tested for stretch and return qualities. See *1964 Book of ASTM Standards.* Thus, this publication states (ASTM Designation D 1566–62 T, p. 801, defendant's exhibit S):

> In some cases, where diluent loading is high (as in flooring and shoe soles), * * the prescribed test [a stretch and return test with different parameters from the Headnote 2 test] *cannot be made* because the rubber has been modified to such an extent that it no longer possesses elastomeric properties. The major polymeric constituent must be identified by other means, and if it is identified as one of the well recognized rubbers which without plasticizers or other diluents would pass the prescribed test, the article is a *rubber product.* [Emphasis added.]

Beyond that the ASTM definition for "rubber products" is totally distinguishable from the ASTM definition for "rubber." *Ibid.* In the present case, we are concerned only with the tariff definition of "rubber" and not with a definition of "rubber products" because (again turning to Judge Rich's concurring opinion, 488 F.2d at 548, 61 CCPA at 25–6):

> If rubber is being defined for the purposes of *all* the tariff schedules, many of which cover products made of or containing rubber in which the rubber is, of necessity, *not* crude but in its finished state—vulcanized, cross-linked or whatever else it may be called—then it must have been the intent of Congress to write a definition that applies to both crude and vulcanized rubber. [Emphasis in original.]

Thus, it becomes apparent that the stretch and return tests prescribed by Headnote 2 must of necessity be applied not only to rubber in its crude state but also in its finished state (i. e., vulcanized, cross-linked or otherwise compounded) if the tariff definition of rubber contained in Headnote 2 is to be applied to TSUS for *all* purposes.

Finally, the amicus curiae argues that the plain meaning of Headnote 2 based on grammatical construction is that the stretch and return tests of that Headnote are applicable only to elastomers in crude form.

However, this very argument has been considered and rejected by the majority decision of the Court of Customs and Patent Appeals in the incorporated case.

IV. *Whether the Imported Footwear Was Properly Classified Under Item 700.60 on the Basis That the Footwear Is in Chief Weight of Plastics or a Combination of Rubber and Plastics*

The defendant in its appeal in the incorporated case attempted to raise an issue based on the alternative contention that the importer had failed to establish that the imported footwear was not over 50 percent by weight of plastics under item 700.60 and that the Government's classification under that provision was therefore presumptively correct. The Court of Customs and Patent Appeals did not consider this question since it was raised for the first time on appeal. 488 F.2d 544, 61 CCPA at 24–5. In essence, defendant now makes that alternative claim here. For the reasons that follow, it must be concluded that this claim is lacking in merit.

■ In the first place, it is obvious from T.D. 74–99, as modified by T.D. 74–196, *supra*, that the sole reason for the Government limiting the decision of the Court of Customs and Patent Appeals in the corporated case was the disagreement with the finding of that Court that the footwear was not rubber. Second, defendant has admitted in its supplemental answer to interrogatory number 3 (plaintiff's exhibit 2), that the classification "was predicated on the assumption that [the footwear] was composed of rubber." In the same answer defendant admitted that this assumption or conclusion was in turn based upon its construction of Schedule 4, Part 4, Subpart B, Headnote 2, "which construction was not upheld in C.A.D. 1112." Since the presumption attendant upon the classification was based on this erroneous conclusion, plaintiff has "disproved the correctness of the assigned classification by showing it resulted from the erroneous reasoning" of the classifying officer. *Hub Floral Corp. v. United States*, 77 Cust.Ct. 21, 23, C.D. 4669, 422

F.Supp. 283, 285 (1976) (*appeal dismissed*, April 5, 1977). The presumption of correctness does not attach to the alternative classification of the footwear as plastics when that alternative classification is negated by defendant's own admissions that the classification was based on the assumption that the footwear was rubber.

Aside from these admissions which establish the erroneous nature of the classification, there are additional considerations which prevent the presumption of correctness from attaching to the alternate classification of the footwear as plastics. Under TSUS, the terms rubber and plastics are mutually exclusive. Schedule 7, Part 12, Headnote 1(a) states that for purposes of the Tariff Schedules "the term '*rubber*' refers to rubber, as defined in part 4B of schedule 4." Schedule 7, Part 12, Headnote 1(b) states that for purposes of the Tariff Schedules "the term '*plastics*' refers to—(i) synthetic plastics materials as defined in parts 1C and 4A of schedule 4 * * * *but does not include rubber.*" [Emphasis added.] Schedule 7, Part 12, Headnote 1(c) states that for purposes of the Tariff Schedules "the term '*rubber or plastics*' means rubber, plastics, or combinations of rubber and plastics." Therefore the classification must have been based on the conclusion that the imported footwear was over 50 percent by weight of one of the three following categories: (1) rubber, (2) plastics, (3) combinations of rubber and plastics.

■ If defendant contends that the presumption attaches to the alternative categories of rubber and plastics, then the presumption of correctness attaches to neither of those categories. *United States v. White Sulphur Springs Co.*, 21 CCPA 203, T.D. 46728 (1933); *Arthur J. Humphreys v. United States*, 66 Cust.Ct. 24, C.D. 4163 (1971); *Domestic Marble & Stone Co. v. United States*, 64 Cust.Ct. 360, C.D. 4003 (1970); *Broadway-Hale Stores, Inc. v. United States*, 63 Cust.Ct. 194, C.D. 3896 (1969); *Gallagher & Ascher Co. v. United States*, 39 Cust.Ct. 1, C.D. 1892 (1957); *S.S. Kresge Co. v. United States*, 25 Cust.Ct. 89, C.D. 1269

(1950); *Sterling Button Co. v. United States*, 4 Cust.Ct. 213, C.D. 324 (1940). Under these decisions, it is clear that defendant cannot contend that its classification is based upon the conclusion that merchandise fell within more than one category of merchandise even if the separate categories fall within the same paragraph or item number. The failure to apprise the importer under which category the merchandise was classified, if the admissions have not already done so, will result in the presumption of correctness attaching to none of those categories.

The decision in *United States v. New York Merchandise Co.*, 435 F.2d 1315, 58 CCPA 53, C.A.D. 1004 (1970) is completely distinguishable from the case at bar. That case involved stuffed animal radios. The Court of Customs and Patent Appeals sustained this court's decision holding the imported merchandise to be properly dutiable as radios under item 685.22, TSUS. The articles were classified by the Government under item 737.30 as toy figures of animate objects. Defendant asserted an alternative classification in the event that its original classification was not upheld, i. e., that the imported articles should be classified as toys, n.s.p.f., under item 737.90. The Court of Customs and Patent Appeals stated that defendant was entitled to the presumption of correctness on its alternative claim because the alternative classification was implicit in the original classification; that is, the original classification and the alternative classification were as toys. The Court held that the defendant was entitled to rely upon the presumption of correctness attaching to the subsidiary finding in the original classification that the imported articles were toys. 435 F.2d at 1318–1319, 58 CCPA at 58–9.

In the case at bar, rubber and plastics are alternative categories and a classification in one of those categories is not implicit from a classification in the other. On the contrary, under Schedule 7, Part 12, Headnote 1(b) those categories are mutually exclusive.

■ However, irrespective of whether the presumption of correctness attaches to the alternative claim by defendant for plastics, such a claim is clearly rebutted by the record in this case. The only competent testimony in this case with respect to the plastics issue was that of plaintiff's witness Dr. Eirich who, as indicated, is a distinguished professor of polymer chemistry, which embraces the entire field of rubber and plastics. Dr. Eirich testified that the components of the midsole in issue as set forth in defendant's exhibit J could not be characterized as a plastic because (1) the constituents (viz., natural rubber, synthetic rubber, stearic acid, and zinc oxide) are not the components used in making plastic; (2) the materials would not meet the statutory definitions for "plastics materials" and "synthetic plastics materials" as contained in TSUS Schedule 4, Part 1, Subpart C, Headnote 3, and Schedule 4, Part 4, Subpart A, Headnote 2; (3) iron powder would not be a filler for plastics materials under the ASTM definition because it is not a "relatively inert" material.

In short, defendant's contention that the imported footwear is in chief weight of plastics or a combination of rubber and plastics cannot be sustained.

## V. *Ultimate Conclusion*

For the foregoing reasons, the court holds that the imported footwear is classifiable, as claimed by plaintiff, under item 700.70 as "[f]ootwear * * * [w]ith soles of material other than leather: [w]ith uppers of vegetable fibers." Judgment will be entered accordingly.

Judgment for plaintiff.