**MIRACLE EXCLUSIVES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 75–12–03317.**

United States Court of International Trade.

Feb. 24, 1981.

Freeman, Meade, Wasserman & Schneider, New York City (Kenneth N. Wolf, New York City, at the trial; Louis Schneider and Angela Pitsaris, New York City, with him on the briefs), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, New York City (Susan Handler-Menahem, Teaneck, N. J., at the trial and on the brief), for defendant.

FORD, Judge:

This action involves the proper classification for duty purposes of certain germination trays known as "Biosnacky" or "Biosta" sprouters, which are manufactured in Switzerland and Canada. It is not disputed by counsel for the respective parties that the imported merchandise is used with water for the purpose of sprouting seeds, which are subsequently eaten.

The merchandise was classified under item 772.15, TSUS, and assessed with duty at 11.5 per centum ad valorem or 8.5 per centum ad valorem, depending upon the date of entry. The statutory language covering the classification is as follows:

> Articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients; and household articles not specially provided for; all the foregoing of rubber or plastics:

> \*   \*   \*   \*   \*   \*   \*

> 772.15      Other ........................ \* \* \*

Plaintiff claims the importations are entitled to entry free of duty under item 666.00, TSUS, which, together with the pertinent headnote, provides as follows:

Schedule 6, Part 4, Subpart C:

*Subpart C headnote* :

1. The provisions of item 666.00 for "agricultural and horticultural implements not specially provided for" do not apply to any of the articles provided for in schedule 6, part 2, part 3 (subparts A through F, inclusive), part 5 (except item 688.40), or part 6, or to any of the articles specially provided for elsewhere in the tariff schedules, but interchangeable agricultural and horticultural implements are classifiable in item 666.00 even if mounted at the time of importation on a tractor provided for in part 6B of this schedule.

666.00   \* \* \* agricultural and horticultural implements not specially provided for, \* \* \*

The record consists of the testimony of two witnesses called on behalf of plaintiff and eight exhibits (exhibit 3 having been withdrawn), as well as the official papers which were received in evidence without being marked.

Mr. Ernest Brunswick, president of plaintiff corporation, testified that he is familiar with both the Biosnacky and Biosta sprouters, having bought and sold them. Both items are identical except for the name and color. Exhibit 1 was offered and received in evidence as representative of the Biosnacky merchandise, and exhibit 2 is representative of the Biosta merchandise. Each exhibit, composed of plastic, consists of the three sprouting trays, a catch basin, a lid, three syphon caps and instructions.

Mr. Brunswick testified that exhibit 3 consisted of a sprouter containing three- or four-day-old sprouts. Exhibit 3 was subsequently withdrawn and replaced with photographs, which were received as exhibits 4 and 5. The top two layers of exhibit 3 are alfalfa and the bottom is a salad mixture consisting of adzuki beans, soy beans, etc. The witness explained the use of the sprouters as follows:

Q. How did the sprouts get there?—A. Well, this explains the usage of the product. You put a teaspoon or so, a thin layer of seeds into each tray. You can use the same seed or three different kinds. You fill the top tray with water, and by means of the syphon action of these little red caps, the water will syphon slowly from one tray to another and finally collect in the bottom. Just sufficient water will be retained in these ridges to keep enough—just enough moisture and not too much for the seeds to grow in. The small seeds you will water again on the fourth day. The large seeds you can water every day. As soon as the water collects in the bottom tray, you discard it. The cover there is to keep the moisture in. The air vents on each side is so it won't mold, gets ventilation. And, in about five days, five to six days, it goes up to the top. [R. 15–16.]

Exhibits 6, 7 and 8 consist of advertisements placed by plaintiff in various magazines. The witness testified that he sold the sprouters nationwide to consumers, distributors, retailers, seed houses and universities. Mr. Brunswick traveled throughout the country attending both national and regional shows of the health food industry showing a growing sprouter and distributing posters and leaflets. He never attended shows directed to farmers. The witness testified the imported sprouters involve soilless growth of seeds by the addition of tap water with no addition of nutrients or fertilizer as is set forth in the definition of hydroponics. Tap water should be used in the sprouter since it contains nutrients, whereas distilled water has the minerals removed. Mr. Brunswick was of the opinion that less than 10 percent of his sales were to universities and 20 percent of his sales were to seed companies. The predominant use is in the home. Mr. Brunswick knows of no other use for the sprouters other than to sprout seeds in water as set forth in the instructions.

Mr. Marvin Olinsky, a horticulturist presently employed by Premiere Brands, Inc. was next called on behalf of plaintiff. Mr. Olinsky, prior to his present employment, was assistant director for horticulture and the first curator/director of the new conservatory at the New York Botanical Gardens. Prior to this employment, he was county agent for Rutgers University and Cornell University. Mr. Olinsky has a degree in horticulture from Delaware Valley College and a masters degree from Lehigh University. He has written professional articles in the field of agriculture and horticulture and currently writes a weekly column. Mr. Olinsky was one of several authors for the American Garden Book and served as a consultant to Time-Life Books. In addition, the witness has lectured in the field of agriculture and horticulture and has appeared on television and radio. Exhibit 9 is a resume of the background of Mr. Olinsky.

According to the witness, horticulture is one part of the science of agriculture, and germination or sprouting is an agricultural or horticultural pursuit.

Mr. Olinsky then testified that a seed is a by-product of the union of the pollen representing the sperm and an ovule. The endosperm which surrounds the embryo within the seed serves as a source of food. Germination results when the seed coat absorbs water and softens and permits the embryo to expand from the bottom as a primary root and from the top as a plant. The witness testified that ordinary tap water can be utilized to germinate a seed, but that controlled amounts of water are of primary concern.

The witness stated that hydroponics is the growing of plant material in a water nutrient solution void of organic matter and soil, and that in his opinion hydroponics is

both an agricultural and horticultural pursuit. Mr. Olinsky testified that he personally used the Biosnacky or Biosta germination trays for the purpose of sprouting the alfalfa seeds which he ate for breakfast that morning. The sprouted seeds were eaten whole and raw. The witness testified that he followed the instructions contained in the imported merchandise, placing seeds in the trays and adding water. Within approximately five days he had sprouts for his salad. In his opinion the germination process he observed in the Biosnacky was a hydroponic process.

On cross-examination Mr. Olinsky testified that in the course of his training and work he became familiar with hydroponics used commercially around the country. The witness stated that in the commercial use of hydroponics the use of nutrients and some manner of support for the plant is of great importance. In the opinion of the witness, hydroponically grown fruits and vegetables would amount to less than 10 percent of the production.

The undisputed evidence of record establishes that, at or about the time of importation, the imported merchandise was solely used as a sprouter for the germination of seeds in a soilless medium. Whether this constitutes hydroponics is one of the points of contention between the parties. Counsel for defendant has quoted a number of definitions which provide for the growing of plants with "liquid nutrient solutions"[1] or "in a solution containing certain necessary mineral salts or rooted in a sand medium".[2] While these definitions might be applicable to the commercial production of plants by hydroponics, the testimony of the botanist witness, Olinsky, makes it evident that such nutrient solutions are not necessary for sprouting seeds. The fact of the matter is that exhibit 3 (which was withdrawn and substituted with photographs received as exhibits 4 and 5) was presented to the court as an established fact, that seeds could be sprouted in the imported merchandise in tap water. No additional nutrient solution or support medium was used. This is a perfect example of the principle of law, utilized in this field of jurisprudence, that a sample often speaks for itself.

█ In addition to the testimony relating to sole and, therefore, chief use of the imported merchandise as sprouting trays, it is well established that a sample is a potent witness on the question of chief use and may permit a finding of primary or chief use when in harmony with other evidence of record. *Oxford International Corp. v. United States*, 70 Cust.Ct. 217, C.D. 4433 (1973); *Wilson's Customs Clearance, Inc. v. United States*, 59 Cust.Ct. 36, C.D. 3061 (1967); *Fred Bronner Corp. v. United States*, 57 Cust.Ct. 428, C.D. 2832 (1966). The court is of the opinion that the chief use of the class or kind of article involved is for the cultivation of edible sprouts from seeds in a soilless medium.

Plaintiff in its reply brief presented the question of the applicability of the presumption of correctness in view of defendant's reliance on the entire provision of 772.15, *supra*. Defendant contends the merchandise falls within the common meaning of several portions of 772.15, *supra*, and, therefore, the presumption of correctness should attach to the classification under the entire provision of 772.15, *supra*. When merchandise is classified under one portion of a tariff provision and the government alternatively claims for classification under another portion of the same tariff provision, the courts have held the presumption of correctness does not attach to the distinctly different article of merchandise covered by the alternative claim. *See United States v. White Sulphur Springs Co.*, 21 CCPA 203, T.D. 46728; *Broadway-Hale Stores, Inc. v. United States*, 63 Cust.Ct. 194, C.D. 3896 (1969).

█ In a classification such as in the case at bar, wherein the classified provision encompasses more than one category of merchandise and no specific classification is set forth, no presumption of correctness at-

---

1. *A Dictionary of Agricultural and Allied Terminology* (1962).

2. *Van Nostrand's Scientific Encyclopedia* (1968), p. 875.

taches. In *International Seaway Trading Corp. v. United States*, 81 Cust.Ct. 92, C.D. 4773, 464 F.Supp. 380 (1978), the court made the following comment:

> If defendant contends that the presumption attaches to the alternative categories of rubber and plastics, then the presumption of correctness attaches to neither of those categories. *United States v. White Sulphur Springs Co.*, 21 CCPA 203, T.D. 46728 (1933); *Arthur J. Humphreys v. United States*, 66 Cust.Ct. 24, C.D. 4163 (1971); *Domestic Marble & Stone Co. v. United States*, 64 Cust.Ct. 360, C.D. 4003 (1970); *Broadway-Hale Stores, Inc. v. United States*, 63 Cust.Ct. 194 C.D. 3896 (1969); *Gallagher & Ascher Co. v. United States*, 39 Cust.Ct. 1, C.D. 1892 (1957); *S. S. Kresge Co. v. United States*, 25 Cust.Ct. 89, C.D. 1269 (1950); *Sterling Button Co. v. United States*, 4 Cust.Ct. 213, C.D. 324 (1940). Under these decisions, it is clear that defendant cannot contend that its classification is based upon the conclusion that merchandise fell within more than one category of merchandise even if the separate categories fall within the same paragraph or item number. The failure to apprise the importer under which category the merchandise was classified, if the admissions have not already done so, will result in the presumption of correctness attaching to none of those categories. [Pp. 104–105.]

Accordingly, no presumption of correctness attaches to the classification in the instant case. Item 666.00, *supra*, has been held to be a chief use provision. *Border Brokerage Company, Inc. v. United States*, 65 Cust.Ct. 277, C.D. 4089, 343 F.Supp. 1396 (1970), *aff'd*, 59 CCPA 151, C.A.D. 1058, 461 F.2d 1383 (1972). General Interpretative Rule 10(e)(i) sets forth guidance for the determination of chief use. Defendant, in its brief, urges alternatively that if item 666.00, *supra*, was determined to be an actual use provision, then plaintiff has failed to comply with General Interpretative Rule 10(e)(ii). As indicated, *supra*, item 666.00 has heretofore been held to be a chief use provision and the court adheres to such finding.

The court notes that headnote 1, subpart c, part 4 of schedule 6 states "[t]he provisions of item 666.00 for 'agricultural and horticultural implements not specially provided for' do not apply * * * to any of the articles specially provided for elsewhere in the tariff schedules * * *." Plaintiff has established to the satisfaction of the court that the imported merchandise is not provided for in item 772.15, *supra*, under which customs classified the merchandise. Additionally it is noted in the *Summaries of Trade and Tariff Information*, Schedule 7, Volume 7 (1968) that it does not appear to cover merchandise of the class or kind involved. At pages 68–69 the following summation is made:

> As is shown in table 3, somewhat more than 80 percent of the value of the imports under consideration has been made up of a miscellaneous group of rubber and plastics housewares (TSUS item 772.-15). Some of the more important of these articles known to have been imported in 1966 were: bathmats, mattress and pillow covers, tumblers, planters, garment bags, flower pots, drinking cups, lampshades, towel racks, and salad bowl sets. Although some of the imports are novelties or unique items, most of them are similar to, and compete directly with, articles of domestic origin.

The array of cases holding an agricultural implement to be one used in the production of food from the *soil* or the raising of domestic animals for food and raiment, *United States v. Boker & Co.*, 6 Ct.Cust. Appls. 243, T.D. 35472; *United States v. Tower*, 6 Ct.Cust.Appls. 562, T.D. 36199, is so numerous additional citations are not necessary. In addition the court has held that only such implements as are used by farmers on farms for the production of food and raiment and not those utilized in marketing are entitled to free entry under such provision. *Staalkat of America, Inc. v. United States*, 59 Cust.Ct. 241, C.D. 3130, 273 F.Supp. 417 (1967), *aff'd*, 56 CCPA 86, C.A.D. 959, 417 F.2d 789 (1969); *Sortex Co. of North America v. United States*, 56 CCPA 41, C.A.D. 951, 410 F.2d 443 (1969).

■ The provision for horticultural implements first appeared in the Tariff Schedules of the United States and was, according to the Tariff Classification Study, included to correct past confusion and anomalous results. It is axiomatic that a tariff term is to be considered in accordance with its common meaning. *Ozen Sound Devices v. United States*, 67 CCPA ——, C.A.D. 1246, 620 F.2d 880 (1980). To ascertain the common meaning of a term in trade and commerce, the court may consult dictionaries and other lexicographic material. *Schott Optical Glass, Inc. v. United States*, 67 CCPA ——, C.A.D. 1239, 612 F.2d 1283 (1979). The term horticulture is defined as follows:

> *horticulture* n. * * * the cultivation of an orchard, garden, or nursery on a small or large scale: the science and art of growing fruits, vegetables, flowers, or ornamental plants—compare *Floriculture, Olericulture, Pomology*. [*Webster's Third New International Dictionary*.]
>
> *horticulture* n. 1 The cultivation of a garden, or the mode of cultivation employed in a garden. 2 That department of the science of agriculture which relates to the cultivation of gardens or orchards, including the growing of vegetables, fruits, flowers, and ornamental shrubs and trees. See synonyms under *Agriculture*. [*Funk & Wagnalls Standard Dictionary*.]

The sprouting of seeds in the imported trays falls within the common meaning of the term horticulture.

In *United States v. S. S. Perry*, 25 CCPA 282, T.D. 49395 (1938), certain celluloid poultry leg bands, which were used for identification purposes, were held to be implements. The court therein held that the term implement should be given a broad meaning and is not limited to or synonymous with a tool or utensil. In *Border Brokerage, supra*, the court held that certain plastic planting bullets, used for propagating trees, both of the crop type and of the ornamental type, were agricultural implements. The court therein, in reviewing the changes made from the Tariff Act of 1930 to the TSUS in 1962, noted the elimination of the distinction between agricultural and horticultural purposes.

■ Under the foregoing it is apparent the sprouting trays involved are horticultural implements entitled to entry free of duty under item 666.00, TSUS, as claimed.

Judgment will be entered accordingly.